**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SEAN BERNARD RUNNINGEAGLE,
                *Petitioner-Appellant,*

v.

CHARLES L. RYAN, Arizona
Department of Corrections,
                *Respondent-Appellee.*

No. 07-99026

D.C. No.
CV-98-01903-PGR

OPINION

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, Senior District Judge, Presiding

Argued and Submitted
February 10, 2011—Pasadena, California

Filed July 18, 2012

Before: Harry Pregerson, Kim McLane Wardlaw, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Wardlaw;
Partial Concurrence and Partial Dissent by Judge Pregerson

## COUNSEL

Jon M. Sands, Federal Public Defender, and Jennifer Y. Garcia and Ashley J. McDonald, Assistant Federal Public Defenders, Phoenix, Arizona, for petitioner-appellant Sean Bernard Runningeagle.

Terry Goddard, Attorney General; Kent Cattani, Chief Counsel, Capital Litigation Section; and Jon G. Anderson, Assistant Attorney General, Phoenix, Arizona, for respondents-appellees Charles L. Ryan et al.

**OPINION**

WARDLAW, Circuit Judge:

Sean Bernard Runningeagle and his cousin Corey Tilden were convicted of murdering Herbert and Jacqueline Williams after they pursued the Williamses into their home in the early morning of December 6, 1987. The state trial court imposed a sentence of death upon Runningeagle, but not upon Tilden. Runningeagle's direct and collateral appeals were rejected by the state courts. Runningeagle now appeals the district court's denial of his federal petition for a writ of habeas corpus. We affirm the district court's decision to deny the petition.

**I.**

We take the facts as recited by the Arizona Supreme Court in its 1993 opinion, *State v. Runningeagle*, 859 P.2d 169 (Ariz. 1993), affirming Runningeagle's conviction and sentence and denying Runningeagle's petition for post-conviction relief:[1]

In the early morning of December 6, 1987, Run-

---

[1]Because this statement of facts is drawn from the Arizona Supreme Court's decision, we afford it a presumption of correctness that may be rebutted only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Moses v. Payne*, 555 F.3d 742, 746 n.1 (9th Cir. 2009). Runningeagle argues against this presumption, citing the Arizona courts' repeated statements that its recitation of facts in criminal appellate opinions presents the facts "in the light most favorable to sustaining the verdict." *See, e.g.*, *State v. Dann*, 74 P.3d 231, 236 n.1 (Ariz. 2003) (citing *State v. Gallegos*, 870 P.2d 1097, 1105 (Ariz. 1994)). Runningeagle's contention is not supported by any federal case law—and in any event, the Arizona standard is equivalent to the standard for sufficiency of the evidence federal courts apply on habeas review. *See, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

ningeagle, Tilden, and their two friends Orva and Milford Antone, were driving around Phoenix. Runningeagle wanted parts for his car, so the foursome stopped at the Davis house, which had a car parked outside. Runningeagle, Tilden and Orva got out of the car, while Milford remained passed out drunk in the back seat. Runningeagle used his large hunting knife to remove two carburetors from the Davis car. Orva put them and an air scoop in the trunk of Runningeagle's car. Tilden and Runningeagle also stole a floor jack and tool box. Orva took a bicycle from the open garage.

Herbert and Jacqueline Williams, an elderly couple, lived next door to the Davises. Mr. Williams came out of his house and told the young men to leave or he would call the police. Orva returned to the car, but Runningeagle and Tilden approached Mr. Williams. Runningeagle concealed his knife by his side. Tilden carried a large, black flashlight. Runningeagle then began to tease and scare Mr. Williams with the knife. Mr. Williams retreated and told Runningeagle to put the knife away. Mrs. Williams then came out of the house and yelled at them. Tilden confronted Mrs. Williams, argued with her, and then hit her on the side of the head with the flashlight. Mr. Williams told them to leave his wife alone, and helped her back into the house. Runningeagle broke through the Williams' door with a tire iron, and he and Tilden barged in.

The noise awakened a neighbor, who heard Mrs. Williams crying and the words "bring him in" spoken by a tall, young man he saw standing in the Williams carport. The neighbor called "911," but by the time the police arrived, Mr. and Mrs. Williams were dead. Mr. Williams suffered several head injuries and five stab wounds, three of which were fatal. Mrs.

Williams also suffered several head injuries, one of which fractured her skull and was possibly fatal, in addition to four stab wounds, three of which were fatal.

The police searched the Williams home. The drawer in which Mrs. Williams stored her jewelry was open and some jewelry was missing. They found an empty purse, blood drops and two bloody shoe print patterns. They discovered Runningeagle's palm print on the clothes dryer next to the bodies.

Runningeagle discussed the crimes on several occasions before his arrest. He told his girlfriend that he had been in a fight with two people and had hit them "full-force." He showed her his car trunk full of the stolen property. He showed the hood scoop and carburetors to another friend. Tilden, too, spoke about the crimes and informed Runningeagle that an account of the burglary was on the radio and that "they got there an hour after we left."

When the defendants were arrested, the police found, among other things, the Davis air scoop with Runningeagle's prints on it, two carburetors, the tool box, Mrs. Williams' wallet and college pin, a large black flashlight with Tilden's prints on it, and the Davis bicycle with Runningeagle's prints on the wheel rim. A Phoenix Police Department criminalist matched Runningeagle's shoes with the bloody shoe prints found at the Williams house, and also found that an inked print of Tilden's shoes made a pattern similar to other shoe prints at the house.

Runningeagle, Tilden, and Orva Antone were indicted on two counts of first degree murder, and one count each of first degree burglary of a residence, second degree burglary of a residence, third

degree burglary of a car, theft of property valued between $500 and $1000, and theft of property valued between $250 and $500. Orva Antone pleaded guilty to burglary and testified for the state at the joint trial.

*Runningeagle*, 859 P.2d at 171-72.

After a five-week trial, Runningeagle and Tilden were convicted on July 27, 1988. Runningeagle was found guilty of two counts of first degree murder, two counts of theft, and one count each of first degree burglary, second degree burglary, and third degree burglary. *Id.* at 171. Tilden was convicted of the same charges except for third degree burglary. *Id.* After several joint sentencing hearings, Runningeagle was sentenced to death on the murder convictions and to prison terms on the non-capital convictions. *Id.* Tilden was sentenced to life terms on the murder charges and to additional prison terms, to be served consecutively, on the remaining counts. *Id.*

The procedural history of this appeal is both lengthy and complicated by the many claims asserted in the numerous state proceedings. However, the district court accurately set forth the procedural background, and we see no need to re-plow the same ground:

> While [Runningeagle's] direct appeal was pending he filed, pro se, a Petition for Post-Conviction Relief [PCR] pursuant to Rule 32 of the Arizona Rules of Criminal Procedure. The Arizona Supreme Court revested jurisdiction in the trial court to resolve the PCR. The trial court appointed counsel, who filed a Supplemental PCR and a Second Supplemental PCR. The trial court summarily denied post-conviction relief. Petitioner moved for rehearing, which also was denied. Petitioner then sought review in the Arizona Supreme Court. The Arizona

Supreme Court granted review and consolidated Petitioner's PCR claims with his direct appeal claims. The Arizona Supreme Court affirmed Petitioner's convictions and sentences and denied post-conviction relief. Petitioner moved for reconsideration, which was denied.

Petitioner, pro se, moved the Arizona Supreme Court to discharge his counsel and proceed pro se. The supreme court granted counsel's motion to withdraw and granted Petitioner's motion to proceed pro se. A pro se writ of certiorari was filed and denied.

Thereafter, the Arizona Supreme Court issued its mandate and filed in the trial court a Notice of PCR on Petitioner's behalf. The trial court allowed Petitioner to continue to proceed pro se. Petitioner did not comply with the deadline for filing a second PCR petition, and the trial court summarily dismissed the post-conviction proceedings.

Next, Petitioner filed a pro se petition for writ of habeas corpus in [the District] Court. The Court appointed counsel, who filed an amended petition. The Court dismissed the amended petition without prejudice, finding that it presented both exhausted and unexhausted claims and concluding that it was not clear whether state post-conviction remedies remained available.

Meanwhile, Petitioner initiated his third PCR proceeding in state court. His third PCR petition ultimately raised forty claims. The PCR court summarily dismissed the petition. Petitioner moved for rehearing, which was denied. Petitioner sought review in the Arizona Supreme Court, which also was denied.

Petitioner commenced the instant action by moving for appointment of counsel. The Court appointed counsel and Petitioner filed an Amended Petition for Writ of Habeas Corpus. Respondents filed an Answer limited to the procedural status of Petitioner's claims.

While the procedural status of Petitioner's claims was under advisement, the Ninth Circuit Court of Appeals issued *Smith v. Stewart*, 241 F.3d 1191 (9th Cir. 2001), calling into question Arizona's doctrine of procedural default. This Court deferred its ruling on the procedural status of Petitioner's claims pending further review of *Smith*. The United States Supreme Court reversed. Contemporaneously, the Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002), which found Arizona's death penalty sentencing scheme unconstitutional because judges rather than juries determined the factual existence of the statutory aggravating circumstances that rendered a defendant eligible for the death penalty. In response, Petitioner moved this Court for a stay of these habeas proceedings so that he could return to state court and pursue post-conviction relief based upon *Ring*. The Court granted the stay with respect to Petitioner's sentencing claims but denied Petitioner's request to stay his conviction-related claims.

Subsequently, in an interim Order, the [District] Court ruled on the procedural status of Petitioner's conviction-related claims. In 2004, the United States Supreme Court held that *Ring* does not apply retroactively. Thereafter [the District] Court vacated its stay of the sentencing-related claims, issued an Order resolving their procedural status, and ordered merits briefing.

On November 27, 2007, the district court denied Runningeagle's remaining claims on the merits, and concluded

that Runningeagle was not entitled to evidentiary development on any claim. The district court also denied a certificate of appealability, concluding that "reasonable jurists applying the standard of review set forth in [its decision] could not debate its resolution of the merits" of Runningeagle's claims. Runningeagle appealed, and on February 24, 2009, a Ninth Circuit judge, citing "the low standard for granting a certificate of appealability," certified five issues for appeal. Runningeagle then filed his timely opening brief, addressing four of those five certified issues.

## II.

We review the district court's denial of the habeas petition de novo and its findings of fact for clear error. *Thompson v. Runnel*, 621 F.3d 1007, 1013 (9th Cir. 2010). Runningeagle filed his amended petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Accordingly, the provisions of AEDPA govern consideration of his claims. Under AEDPA,

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Federal habeas relief may not be granted for claims subject to § 2254(d) "unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of [the Supreme] Court; or that it 'involved an unreasonable application of' such law; or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (citations omitted).

## III.

Runningeagle argues that prosecutors withheld evidence obtained from Manuel Melendez, a former cell-mate of Tilden's, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Relying on Melendez's testimony at a hearing in a separate criminal prosecution against Melendez and a note Runningeagle's first habeas lawyer reportedly found in the state's criminal file,[2] Runningeagle maintains that Melendez may have told prosecutors that Tilden committed the murders alone. Runningeagle cannot make out a *Brady* claim because he can only speculate as to what Melendez, who is now deceased, told prosecutors, and so cannot demonstrate that

---

[2]On July 19, 2006, Kyle Marie Wesendorf, an attorney who worked on Runningeagle's first habeas petition, signed an affidavit stating that in early 1995 she found an unsigned note reading "TILDEN THE KILLER" in the criminal file maintained by the Maricopa County Attorney's Office. Runningeagle asked the district court to expand the record to include the affidavit, which was never presented to the state courts. The district court refused, citing 28 U.S.C. § 2254(e)(2). Apart from the evidentiary concerns—the note, if it existed, was unsigned and ambiguous, and is linked to prosecutors only by Wesendorf's speculation—the affidavit is not relevant because it was not presented to the state courts. Runningeagle concedes that the note is not itself *Brady* material, and so does not comprise the basis for a separate *Brady* claim, but argues that it might support his claim about Melendez's statements. However, where, as here, the state courts adjudicated a claim on the merits, review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

any withheld evidence would have been favorable or material. The Arizona courts' denial of this claim was therefore not an unreasonable application of or contrary to clearly established law. *See* 28 U.S.C. § 2254(d)(1).

**A.**

The facts relevant to Runningeagle's *Brady* claim are as follows: Runningeagle, Tilden, and Orva Antone were arrested on December 19, 1987. While awaiting trial, Tilden, who was represented by the Maricopa County Public Defender's Office, was housed in a cell with Melendez, who was represented by both the public defender's office and outside counsel. Through his public defender, Melendez communicated with prosecutors about the murders of Herbert and Jacqueline Williams, and offered to testify in exchange for a plea agreement in his own criminal case. After prosecutors had spoken with Melendez repeatedly, however, Antone agreed to testify against his co-defendants, and prosecutors told Melendez that they did not need his testimony.

Because Melendez was a potential witness against Tilden and both were represented by different counsel from the same public defender's office, Tilden's public defense counsel, on April 20, 1988, filed a "motion to determine counsel" to ascertain whether he was required to withdraw from representation of Tilden given the conflict between the public defenders that arose from inmate Melendez's discussions with Tilden's prosecutors. Tilden's attorney served the motion upon Runningeagle's counsel. The motion papers recounted that prosecutors had been investigating whether Melendez "had knowledge of information concerning the allegations against [Tilden] . . . [and] would be in a position to testify . . . ." Further, the trial judge assigned to Melendez's criminal case had ordered Melendez's outside counsel to take over Melendez's representation to screen out the public defender's office. However, Tilden's counsel had been subsequently informed that the prosecution no longer intended to call

Melendez at Tilden's trial. The trial judge ruled that there was no conflict of interest because the prosecution had decided not to call Melendez as a witness.

Melendez subsequently entered into a plea agreement in his case, but, following Runningeagle's and Tilden's convictions, moved to withdraw his guilty plea. At a July 29, 1988, hearing on this motion, Melendez testified that he had gained information about the murders from Tilden and that he had shared that information during three meetings with homicide detectives and prosecutors. However, Melendez never testified precisely as to what information Tilden had shared with him or what information he shared with prosecutors. In April of 1988, around the time Antone agreed to testify, prosecutors stopped meeting with Melendez. Melendez testified that "it was specifically expressed to me by the prosecution and homicide detectives that they wanted to make the three people —they didn't want any one of them to turn over on any one person" and that "they wanted to convict all three of the charges."

Although prosecutors told Tilden's attorneys about their meetings with Melendez, they never directly informed Runningeagle's counsel and they never provided Runningeagle with any information about what Melendez said. Runningeagle's attorney received a copy of the motion to determine counsel from Tilden. Therefore, Runningeagle's counsel was on notice that Melendez had been communicating with the prosecutors and was a potential witness against Tilden. However, he did not investigate further by contacting or interviewing Melendez or attempting to obtain any *Brady* material specifically regarding Melendez from the detectives and prosecutors.

**B.**

As an initial matter, we must determine whether the Arizona courts denied this claim on the merits, or instead deter-

mined that the claim was procedurally defaulted under state law because Runningeagle failed to raise it until his third state PCR. We review a denial on the merits under AEDPA to determine whether it was an unreasonable application of clearly established federal law. *See Richter*, 131 S. Ct. at 785. However, we would not be able to review the state court's conclusion that this claim was procedurally defaulted under Arizona law. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) ("When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court.").

In ruling on Runningeagle's third PCR, the Arizona Superior Court found that the *Brady* claim was "precluded pursuant to [Arizona Rule of Criminal Procedure] 32.2(a)(3)," which precludes relief based on any ground that "has been waived at trial, on appeal, or in any previous collateral proceeding." While this ruling was clearly on procedural default grounds, "[s]tate procedural bars are not immortal . . . [and] may expire because of later actions by state courts." *Ylst*, 501 U.S. at 801. Ruling on Runningeagle's subsequent request for clarification, the court did not adhere to its procedural-default ruling, but instead stated that the *Brady* claim did not satisfy the requirements of Arizona Rule of Criminal Procedure 32.1(e). Rule 32.1(e) provides grounds for post-conviction relief if "[n]ewly discovered material facts probably exist and such facts probably would have changed the verdict or sentence." Facts are "newly discovered" and "material" if: (1) they were discovered after trial; (2) the defendant exercised due diligence in securing them; and (3) they "are not merely cumulative or used solely for impeachment, unless the impeachment evidence substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or the sentence." Ariz. R. Crim. P. 32.1(e). The court then summarily dismissed the claim "pursuant to [Arizona Rule of Criminal Procedure] 32.6(c)," which requires courts considering post-conviction relief petitions to first "identify all claims that are

procedurally precluded under this rule," and then, "after identifying all precluded claims," dismiss any petition if the court "determines that no remaining claim presents a material issue of fact or law which would entitle the defendant to relief under this rule and that no purpose would be served by any further proceedings."

The state court decisions are ambiguous, and so whether the Arizona courts denied this claim on the merits is a close question. The Arizona Superior Court's initial dismissal relying on the procedural default rule of Rule 32.2(a)(3) was followed by a holding relying on Rule 32.1(e), which functions as a procedural-default rule, but which also addresses the relevant merits of facts discovered after trial. The court then summarily dismissed the claim under Rule 32.6, which addresses both claims that are procedurally defaulted and claims that do not succeed on the merits. We rely on the "presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis." *Richter*, 131 S. Ct. at 784-85 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)). Accordingly, we presume that the Arizona Superior Court denied this claim on the merits, and review that denial to determine whether the state court unreasonably applied clearly established federal law.[3] *Id.*

## C.

**[1]** In *Brady*, the Supreme Court held that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. *Brady* violations have three components: "The evidence at issue must be favorable to the accused, either because it is exculpa-

---

[3]We may deny the *Brady* claim on the merits "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

tory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). As we have observed, "[t]he terms 'material' and 'prejudicial' are used interchangeably in *Brady* cases." *Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002) ("Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material.' Thus, for *Brady* purposes, the two terms have come to have the same meaning."). Evidence is material under *Brady* "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Thus, Runningeagle must demonstrate that Melendez's statements were both favorable and material. *Strickler*, 527 U.S. at 281-82. However, to state a *Brady* claim, he is required to do more than "merely speculate" about what Melendez told prosecutors. *See Wood v. Bartholomew*, 516 U.S. 1, 6, 8 (1995) ("[W]here, as in this case, a federal appellate court . . . grants habeas relief on the basis of little more than speculation with slight support, the proper delicate balance between the federal courts and the States is upset to a degree that requires correction."); *see also Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.") (quoting *United States v. Croft*, 124 F.3d 1109, 1124 (9th Cir. 1997)); *Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) (rejecting a *Brady* claim in part because the petitioner's arguments were speculative); *United States v. Abonce-Barrera*, 257 F.3d 959, 970 (9th Cir. 2001) (finding that evidence was not material under *Brady* where the defendant had only "a hunch" that the evidence would be useful).

**[2]** While evidence that Tilden alone killed the Williamses would have been favorable and material, ultimately Run-

ningeagle's claim that Melendez pointed the finger solely at Tilden is based only on speculation. The transcript of Melendez's hearing on his request to withdraw his guilty plea shows only that he provided prosecutors with information obtained from Tilden, and that the government declined to use him as a witness once Antone, a co-defendant, turned on the other two defendants. As Runningeagle acknowledges in his reply brief, "it remains difficult . . . to develop the exact contours of the *Brady* claim because the State has still never disclosed any of the evidence provided by Melendez . . . ." In attempting to demonstrate that Melendez's statements were favorable, or even admissible, Runningeagle therefore resorts to inference and supposition. To demonstrate that Melendez's statements would have been exculpatory, for example, Runningeagle argues that prosecutors would not have met with Melendez repeatedly if the statements were useless. Even if Runningeagle is correct that Melendez's statements were valuable, however, Runningeagle still cannot prove what Melendez actually said.

**[3]** While we can infer that Melendez would have implicated Tilden, we have no way of knowing that his testimony would exculpate Runningeagle—and even if Melendez's testimony did tend to exculpate, such testimony by a jailhouse informant, a notoriously unreliable source, was unlikely to have changed the outcome of the proceedings, either at trial or, particularly, during sentencing by the judge. *See Cone*, 129 S. Ct. at 1783; Hon. Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1383-85 (1996) (discussing the perils of witness testimony at trial from criminals who "are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law"). The evidence against Runningeagle was substantial: the police found Runningeagle's palm print on the clothes dryer next to the victims' bodies and matched Runningeagle's shoes with the bloody shoe prints found at the house. *Runningeagle*, 859 P.2d at 171-72. Runningeagle discussed the crimes several

times before his arrest and told his girlfriend—who testified at trial, and to whom he showed his car trunk full of the property stolen from the Williamses—that "he had been in a fight with two people and had hit them 'full-force.' " *Id.* When the police arrested Runningeagle, they found the Williamses' stolen property. *Id.* The evidence is even stronger in light of Antone's testimony that Runningeagle taunted and threatened the Williamses with his knife, waved the knife at them as they retreated, and then broke through the Williamses' door with a tire iron after the Williamses tried to get away. *Id.*[4] There was more than sufficient evidence upon which a rational trier of fact could have concluded that Runningeagle was guilty of the murders. Assuming that Melendez's statements implicated Tilden, those statements would have added to the evidence supporting Tilden's conviction, and not materially detracted from the overwhelming evidence of Runningeagle's guilt.

[4] The failure of Runningeagle's counsel to investigate after receiving a copy of Tilden's motion for determination of counsel and learning about the existence of an informant who was willing to testify against Tilden may well have been both deficient and prejudicial. That said, Runningeagle does not make a claim of ineffective assistance of counsel based on his attorney's decision not to investigate after receiving that motion, so we do not consider this claim. However, we note that the government has an independent obligation to provide *Brady* material if it exists, and trial counsel did make a request for all *Brady* material. At this point in a long procedural history, however, as counsel for Runningeagle concedes, it cannot be known whether exculpatory or impeaching material exists, or whether it ever existed. As Runningeagle

---

[4]Runningeagle argues that in weighing the evidence, we should disregard Antone's testimony, because the prosecutor's statement during opening that Antone would testify truthfully constituted improper vouching. This vouching claim, which the Arizona state court found procedurally defaulted, was not certified for appeal, and so is not before us. *See* 28 U.S.C. § 2253(c)(1). Accordingly, there is no reason for us to disregard Antone's testimony.

can only speculate as to what Melendez told prosecutors, Runningeagle cannot demonstrate that Melendez's statements were exculpatory or useful for impeachment, or that there is a reasonable probability that had Melendez's statements been disclosed, the outcome of the trial or of the sentencing would have been different. Because Runningeagle cannot make out a *Brady* claim, the state court's denial of his claim was not an unreasonable application of clearly established federal law. *See Strickler*, 527 U.S. at 281-82.

## D.

Even if we were to conduct de novo review of the *Brady* claim, limited to the sentencing phase,[5] we could not agree on this record that "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 129 S. Ct. at 1783 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

---

[5]Judge Pregerson, in his dissent, agrees that the evidence of Runningeagle's guilt was overwhelming. With regard to sentencing, he argues that the Arizona Superior Court applied an erroneous materiality standard to the *Brady* claim and that the habeas denial was thus contrary to clearly established federal law. With respect for Judge Pregerson's views, however, we are required to use a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 131 S. Ct. at 1398. The Arizona court could have found that no material facts were "newly discovered" under Rule 32.1(e), and denied the claim on that ground. Runningeagle's counsel had contemporaneous notice that Melendez was a potential witness against Tilden from the motion to determine counsel. Therefore, "the Government d[id] not commit a *Brady* violation by not bringing the evidence to the attention of the defense." *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (quotation omitted). Melendez was alive and available at that time and Runningeagle could have, through the exercise of minimal diligence, secured an interview or testimony from him. Any post-trial facts averred here are thus not "newly discovered" under Rule 32.1; therefore, regardless of the correctness of the materiality standard, under Arizona law, the *Brady* claim lacked merit.

**[5]** Assuming the existence of a "Melendez file" that contains evidence that Melendez was prepared to testify that Tilden stabbed the Williamses, the trial court's detailed Special Verdict makes clear that the likely result of further inculpation of Tilden was a death sentence for Tilden and not a life sentence for Runningeagle.[6] The sentencing judge assumed that Tilden and Runningeagle were equally responsible for the murders, but distinguished Tilden's individual character and propensity from Runningeagle's, finding that Tilden had more mitigating factors in his favor. The lighter sentence meted out to Tilden was not based solely on Runningeagle's role as the stabber. Nothing that Melendez said could have blunted the overwhelming evidence that Runningeagle did the stabbing, that he possessed the stolen goods and that he was undeserving of mitigation. The dissent's view that it may have been Tilden who did the stabbing has no basis in the evidence.

The judge conducted an individual sentencing determination, considered mitigating factors and "set forth her findings

---

[6]At oral argument, when asked about the "Melendez file," the Warden's counsel indicated that "I assume there must be [one], I have no idea . . . . I've never looked through the Melendez file." Counsel also stated that "we don't know what the material was, we don't know if there was a *Brady* violation." After a criminal conviction is final on direct appeal, prosecutors have no further duty under *Brady* to produce exculpatory evidence to a defendant. *Dist. Attorney's Office v. Osborne*, 129 S. Ct. 2308, 2320 (2009). However, the Arizona Supreme Court has held that in post-conviction proceedings, the State has a continuing duty to produce *Brady* material in its files. *See Canion v. Cole*, 115 P.3d 1261, 1264 (Ariz. 2005) ("[W]e affirm that the State must disclose clearly exculpatory evidence that comes to its attention after a trial has concluded."). Ethical duties beyond those imposed by *Brady* and the Due Process Clause may also compel prosecutors to disclose exculpatory evidence at any time they become aware of it. *See Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) ("[A]fter a conviction the prosecutor is also bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction."). Therefore, if a "Melendez file" exists and contains exculpatory evidence, the State is ethically required to produce it, whether or not a further evidentiary hearing is held.

separately as to each defendant." As to Runningeagle, she found three aggravating factors. First, she found that his conduct before and after the crimes showed that he "clearly was at the location to rob; he expected pecuniary gain." Second, she found that the murders were especially cruel, heinous and depraved for numerous reasons, including the fact that the victims both suffered tremendous and horrific "mental and physical pain" before their deaths, that "Runningeagle first taunted both victims with his knife," that "both defendants laughed as they came back to the car" after killing the Williamses and that Runningeagle "bragged to his girlfriend about having been in a 'good fight.' " Third, she found that the offense involved multiple homicides.

As to Tilden, the judge found only two aggravating factors. First, she found, for the same reasons stated for Runningeagle, that the murders were especially cruel, heinous and depraved and that "the force used to beat these two elderly small people was senseless and gratuitous." She noted that Tilden did not relish the murders to the same degree as Runningeagle, who "on two occasions made reference to a good fight." Second, she found that the offense involved multiple homicides. However, the judge specifically found that the State failed to prove that Tilden sought pecuniary gain from the crimes because the items stolen from the Williamses were found only in Runningeagle's car and bedroom.

The judge also addressed the mitigating factors for each of the defendants, finding "significant and considerable differences" in their "characters, backgrounds and propensities." She found that Runningeagle's age was the only mitigating factor in his favor, but not one "sufficient to call for leniency." The judge explained that "based on the evidence presented, it is clear that [Runningeagle] is a highly intelligent young man, that he was much the leader, the initiator of events that occurred that evening." She found that his family history and mental health history were not mitigating factors, explaining that Runningeagle "is in touch with reality, [and]

is not suffering from any type of [mitigating] mental disorder or disease."

In contrast, the judge found that Tilden's age and history of family problems were mitigating factors in his favor. She found that "unlike defendant Runningeagle, defendant Tilden has a conscience and the ability to feel remorse and sympathy." Also unlike Runningeagle, Tilden's "personality disorder is treatable, he is capable of rehabilitation." The judge found that Tilden followed Runningeagle's lead, both in the initial theft of car parts and in the subsequent confrontation and murders. Finally, the judge discussed the lack of any evidence that "Tilden inflicted any of the horrendous stab wounds."

[6] The trial judge, before addressing Tilden's mitigating circumstances, stated that "[i]n a case such as this where two people have been convicted of the same brutal murders, it is natural to want to impose the same sentence, imposing the same responsibility." She then explained that her decision not to impose a death sentence upon Tilden was warranted by the "significant and considerable differences" in "their characters, backgrounds and propensities." She noted that defendant Runningeagle was found by two independent psychologists as lacking a conscience and extremely dangerous; whereas "Tilden had a conscience, the ability to feel remorse and sympathy." Most significantly, the trial judge noted that her comparison of the two defendants' circumstances and characteristics served "not . . . in aggravation of Runningeagle's sentence," but only in mitigation of Tilden's. Therefore, if Melendez's testimony had been used to further aggravate Tilden's responsibility, only the outcome of Tilden's sentencing is likely to have been different. There is thus no "reasonable probability that, had the [hypothetical] evidence been disclosed, the result of the [sentencing] would have been different."

## E.

**[7]** In pursuing this *Brady* claim, Runningeagle has at various times asked for additional discovery, expansion of the record before the district court, and an evidentiary hearing to determine what Melendez said to prosecutors. The district court denied those requests under 28 U.S.C. § 2254(e)(2) after concluding that Runningeagle failed to exercise due diligence in developing the facts before the state courts. Runningeagle renews those requests and argues that the district court erred because he in fact sought to develop the record but was prevented by the state courts from doing so. Regardless of whether Runningeagle acted diligently, however, or of whether he was entitled to a hearing in state court, he is not entitled to an evidentiary hearing or additional discovery in federal court because his claim is governed by 28 U.S.C. § 2254(d)(1). As the Supreme Court has recently held, review of such claims "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. Even if the Arizona courts had not denied this claim on the merits, but had found the claim procedurally defaulted under state law, Runningeagle would not be entitled to a hearing, because the state court's decision would not be reviewable in federal court. *See Ylst*, 501 U.S. at 801. Accordingly, we deny Runningeagle's request.

## IV.

Next, Runningeagle argues that his trial attorney rendered ineffective assistance of counsel by failing to join Tilden's motion to sever their trials. The Arizona Supreme Court concluded that trial counsel was not deficient, because the two defendants did not assert mutually antagonistic defenses. As there is no clearly established federal law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses, and as Tilden's and Runningeagle's defenses were not in fact mutually exclusive or antagonistic, the Arizona Supreme Court's holding was not

an unreasonable application of the standard established in *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

**A.**

On April 22, 1988, Tilden's counsel filed a motion for severance, arguing that: (1) evidence might be introduced that would be admissible against one defendant but not against another; (2) Tilden would be prejudiced by the "much stronger" scientific and physical evidence demonstrating that Runningeagle was guilty; and (3) the co-defendants' defenses were "antagonistic, irreconcilable and mutually exclusive to an extent that in order to believe the core of the evidence offered on behalf of [Tilden], a jury must disbelieve the core of the evidence offered on behalf of [Runningeagle]." At a May 26, 1988 hearing, Runningeagle's attorney told the judge that he did not join the motion, and "take[s] no position to sever." On June 3, 1988, the trial court denied the motion after finding "that the evidence expected to be presented at trial is not 'so drastically disproportionate nor do the defenses appear to be so antagonistic,' if at all antagonistic, to require severance."

On July 7, 1988, Tilden's attorney renewed his motion to sever, explaining that his cross-examination would "go right back through, only in more detail, every item taken and every item where it was found," and so "effectively assist[ ] the prosecutor against the co-defendant in my case." Runningeagle's attorney again took no position on the motion. The trial court denied the renewed motion, reasoning, "I don't think it's a situation where you would have to disbelieve one defense to believe the other. I think you could believe both or disbelieve both."

Denying Runningeagle's petition for post-conviction relief, the Arizona Supreme Court rejected Runningeagle's ineffective assistance claim after concluding that the co-defendants' defenses "were not antagonistic to the point of being mutually

exclusive." *Runningeagle*, 859 P.2d at 173. Because sever-
ance was not required, trial counsel's "failure to take a posi-
tion on the motion to sever was not deficient." *Id.* Addressing
Tilden's contention that the trial court erred by denying the
motion, the court further explained:

> Tilden's "alibi of non-presence" defense is not
> antagonistic to Runningeagle's "insufficiency of
> state's evidence" defense. In *State v. Cruz*, this court
> held that:
>
>> a defendant seeking severance based on
>> antagonistic defenses must demonstrate that
>> his or her defense is so antagonistic to the
>> co-defendants that the defenses are mutu-
>> ally exclusive. Moreover, defenses are
>> mutually exclusive within the meaning of
>> this rule if the jury, in order to believe the
>> core of the evidence offered on behalf of
>> one defendant, must disbelieve the core of
>> the evidence offered on behalf of the co-
>> defendant.
>
> *See Zafiro v. United States*, 506 U.S. 534 (1993)
> (holding that mutually antagonistic defenses are not
> prejudicial per se). Tilden claimed that he was not
> guilty because he was at home on the morning of the
> murder. Runningeagle argued that the state's evi-
> dence was insufficient to convict him. The defenses
> are unrelated. The jury could have believed both,
> one, the other, or neither. The court did not err in
> denying the motion to sever.

*Runningeagle*, 859 P.2d at 178-79.

## B.

To establish ineffective assistance of counsel, "a defendant
must show both deficient performance by counsel and preju-

dice." *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009). To establish deficient performance, Runningeagle must show that his "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To establish prejudice, he must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010), especially in a habeas petition. *See Richter*, 131 S. Ct. at 778. In addressing ineffective assistance claims under § 2254(d), "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 785.

**[8]** Runningeagle maintains that the Arizona Supreme Court correctly identified the controlling legal precedent by citing to *Zafiro*, but unreasonably applied that precedent because the co-defendants' defenses were in fact mutually exclusive. Runningeagle, however, "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the [state] Supreme Court's decision." *Pinholster*, 131 S. Ct. at 1402. The Supreme Court has explicitly rejected a per se rule requiring severance where two defendants present mutually antagonistic defenses. *See Zafiro*, 506 U.S. at 538-39. Moreover, the record supports the Arizona Supreme Court's conclusion that the defenses were not in fact mutually antagonistic.

Runningeagle agrees with the Arizona Supreme Court's characterization of the defenses: Tilden claimed he was not guilty because he had an alibi, and Runningeagle claimed that the state's evidence was insufficient to convict. *Runningeagle*, 859 P.2d at 178-79. When arguing that his client was at home asleep at the time of the murders, however, Tilden's attorney

highlighted the evidence against Runningeagle—and so, Runningeagle argues, *effectively* mounted an antagonistic defense. During his opening, for example, Tilden's counsel stated:

> I don't represent Mr. Running Eagle.[7] And my client's guilt or innocence does not rest upon his guilt or innocence. As you can see through my opening statement, I have used him as a control for my client. We may become greater adversaries throughout this process, but it's not a joint defense.
>
> I represent Corey Tilden, not Sean Running Eagle. And I am going to show you that the State doesn't have the evidence against my client. And my client is going to get up here and tell you that he was home sleeping the night that this occurred. And the only reason he is here is because he lived with his first cousin and his mother, and that is it. It's the only thing that the government has against my client.

During closing arguments, Tilden's attorney stated that his client was guilty under the prosecution's theory "because he associates with a human-being by the name of Sean Running Eagle." He argued that all of the physical evidence linked Runningeagle to the murders, and none of it pointed to Tilden:

> They have nothing, ladies and gentlemen, in terms of physical evidence [from Tilden] at the scene. They have Sean's print on the outside, in the kitchen, in the utility room, and on the door. Interesting comparison. If this is guilt beyond a reasonable doubt, ladies and gentlemen, what is this? Reasonable doubt? Lack of sufficient evidence to prove my client guilty?

---

[7]The court reporter misspelled Runningeagle's name throughout the trial transcript as "Running Eagle."

Tilden's attorney repeatedly compared the evidence against
Tilden to the evidence against Runningeagle: "[L]et's com-
pare Sean Running Eagle, Corey Tilden. [The prosecutor] has
stood up here and told you that he has a case of guilt beyond
a reasonable doubt against Sean Running Eagle. The real
question he says is, does he have one against Corey Tilden?
So it works a nice comparison."

Runningeagle attempts to support his argument that the trial
court was required to sever the co-defendants' trials by point-
ing to two decisions in which the Supreme Court has
addressed when or whether federal (rather than, as here, state)
criminal trials of co-defendants should or must be severed. In
*United States v. Lane*, 474 U.S. 438, 446 n.8 (1986), the Court
observed that, with regard to federal defendants, "[i]mproper
joinder does not, in itself, violate the Constitution. Rather,
misjoinder would rise to the level of a constitutional violation
only if it results in prejudice so great as to deny a defendant
his Fifth Amendment right to a fair trial." In *Zafiro*, 506 U.S.
at 538-39, the Court held that, under Federal Rule of Criminal
Procedure 14(a), severance is not automatically necessary
even where co-defendants present mutually antagonistic
defenses, because "[m]utually antagonistic defenses are not
prejudicial per se." A court should grant a severance under
Rule 14 "only if there is a serious risk that a joint trial would
compromise a specific trial right of one of the defendants, or
prevent the jury from making a reliable judgment about guilt
or innocence." *Zafiro*, 506 U.S. at 538-39.

There are two critical problems with Runningeagle's argu-
ment. The first is that, even if he is correct that the co-
defendants presented mutually antagonistic defenses, we have
explicitly concluded that *Zafiro* and *Lane* do *not* "establish a
constitutional standard binding on the states and requiring
severance in cases where defendants present mutually antago-
nistic defenses." *Collins v. Runnels*, 603 F.3d 1127, 1131 (9th
Cir. 2010). In reaching that holding, we found that the state-
ment in *Lane* regarding when misjoinder rises to the level of

constitutional violation was dicta and that *Zafiro* is not binding on the state courts because it addresses the Federal Rules of Criminal Procedure. *Id.* at 1131-33. Neither decision is "clearly established Federal law" sufficient to support a habeas challenge under § 2254. *Id.*

**[9]** The second problem with Runningeagle's argument is that the Arizona Supreme Court correctly found that Runningeagle's and Tilden's defenses were not in fact mutually antagonistic. As the Court concluded, the jury could have believed both Tilden's alibi argument and Runningeagle's insufficiency of the evidence argument. Tilden's defense was that he was innocent; Runningeagle's defense rested on the theory that the state failed to meet its burden of proof. *See Runningeagle*, 859 P.2d at 178-79. That Tilden highlighted the state's paucity of evidence as to his guilt by focusing on the physical evidence implicating Runningeagle does nothing to change this fact. As the jury was explicitly instructed, the arguments of counsel are not evidence.[8] Moreover, any juror confusion was cured by the trial court's instruction that "[e]ach defendant is entitled to have his guilt or innocence as to each of the crimes charged determined from his own conduct and from the evidence which applies to him if he were being tried alone." *Id.* at 178 (citing *Zafiro*, 506 U.S. at 540-41).

**[10]** Runningeagle, moreover, does not challenge the Arizona court's conclusion that where severance is not required, counsel's choice against taking a position on the severance motion is not deficient performance. *See Runningeagle*, 859 P.2d at 173. The Arizona Supreme Court's determination that

---

[8]The jury was instructed: "In the opening statements and closing arguments the lawyers have talked to you about the law and evidence. What the lawyers said is not evidence but it may help you to understand the law and the evidence."

Runningeagle's attorney's performance was not deficient was not unreasonable.[9]

## V.

Runningeagle also asserts ineffective assistance of counsel for failure to seek a separate sentencing hearing. He argues that the joint sentencing proceedings allowed Tilden to emphasize Runningeagle's guilt relative to his own, which prevented the trial court from making the individualized sentencing determination required in a capital case. *See Zant v. Stephens*, 462 U.S. 862, 879 (1983).[10] The record, however, demonstrates that Tilden's attorney, instead of attacking Runningeagle, in fact presented mitigating evidence, and that the

---

[9]Runningeagle's trial attorney later told an investigator that he had not attempted to sever Runningeagle's case because he believed that he and Tilden's attorney were acting as a team. Runningeagle argues that this belief was so unreasonable as to render his attorney's performance deficient. However, attorneys must have "wide latitude" in making "tactical decisions." *See Strickland*, 466 U.S. at 689. Moreover, even if Runningeagle's counsel made a poor strategic choice, his performance was still not deficient, because severance was not required. Because we find that the Arizona Supreme Court's holding as to deficiency was not unreasonable, we need not reach the question of whether Runningeagle's counsel's choice prejudiced his client. *See Strickland*, 466 U.S. at 694.

[10]The parties disagree as to whether this claim was procedurally defaulted; the district court found that it was not, and denied it on the merits. We review procedural default rulings by the district court de novo. *See, e.g.*, *La Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001). Runningeagle raised this argument in his first supplemental petition for state post-conviction relief, but the trial court declined to address it because the issue of severance was then pending on appeal. Thereafter, Runningeagle did not clearly raise the argument before the state courts; the Arizona Supreme Court did not explicitly address the issue. However, we need not determine whether this claim was procedurally defaulted, because it was addressed by the district court and has been fully briefed, and we may therefore exercise our discretion under 28 U.S.C. § 2254(b)(2) to deny the claim on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See also Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999).

trial court imposed individualized sentences after explicitly and separately considering the mitigating and aggravating evidence for and against each defendant.

The district court reviewed this claim de novo because the Arizona Supreme Court failed to resolve it on the merits, leaving no state court decision to which to defer. It is not entirely clear whether we should follow suit, or instead conduct the more deferential AEDPA review. *Compare Richter*, 131 S. Ct. at 784-85 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."), *with Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) (federal courts review properly raised claims that were not decided by state courts on the merits de novo), *with Murdoch v. Castro*, 609 F.3d 983, 991 n.6 (9th Cir. 2010) ("Even when there is no reasoned state court opinion explaining the denial of a defendant's claim in any respect, we 'must assume that the state court has decided all the issues and 'perform an independent review of the record to ascertain whether the state court decision was objectively reasonable.' ") (quoting *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006)). We need not decide this question on the convoluted procedural history here, however, because the claim fails under either standard.

**[11]** "The right to effective assistance of counsel applies not just to the guilt phase, but 'with equal force at the penalty phase of a bifurcated capital trial.' " *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d 1373, 1378 (9th Cir. 1995)). Again, to establish ineffective assistance of counsel, "a defendant must show both deficient performance by counsel and prejudice." *Knowles*, 129 S. Ct. at 1413. The crux of Runningeagle's deficiency argument is that an effective attorney would have recognized that a joint sentencing proceeding could result in prejudice.[11] *See Strick-*

_____

[11]Runningeagle also raises and conflates numerous other claims which were not certified for appeal and are thus not before us. For example, Run-

*land*, 466 U.S. at 688 ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.").

**[12]** Ordinarily, defendants have no constitutional or statutory right to separate sentencing proceedings. Instead, "[g]iven that the imposition of death by public authority is so profoundly different from all other penalties," the Supreme Court has held that the defendants have a right to "an individualized decision . . . in capital cases." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). This means "that the sentencing decision [must] be based on the facts and circumstances of the defendant, his background, and his crime." *Clemons v. Mississippi,* 494 U.S. 738, 748 (1990). Runningeagle argues that, because Tilden was able to argue that Runningeagle was the more culpable party in the jointly held sentencing proceedings, Runningeagle did not receive an individualized sentencing determination, and hence the trial court violated his Eighth Amendment rights.

**[13]** Runningeagle's argument relies on a mischaracterization of the sentencing proceedings. While it is true that Tilden's attorney suggested that only Runningeagle could be linked to the stabbing wounds, Tilden's strategy on the whole was to present his own mitigation evidence rather than to blame Runningeagle. Thus, contrary to Runningeagle's contentions, Tilden's counsel did not act as a "second prosecutor" of Runningeagle during sentencing. As the district court accurately recounted:

> At sentencing, Tilden presented the testimony of psychologist Donald Tatro, who opined that Tilden suffered from a personality disorder but not an anti-

ningeagle argues that his counsel was ineffective for failing to raise certain arguments at sentencing, and suggests that the trial court violated his Eighth Amendment rights by failing to provide an individualized sentence.

social personality disorder. . . . Following Dr. Tatro's testimony, Tilden presented a number of family and friends who testified about his difficult family background, his efforts to complete his education, and their opinion that the circumstances of the crime were out of character for him. During closing argument, Tilden argued that his age — eighteen — was a statutory mitigating factor, and that other mitigating circumstances, including his difficult family background, personality disorder, love of family, and lingering doubt about how much Tilden participated in the murders, called for a lenient sentence. During closing argument, Tilden focused on his own mitigation; he did not attack [Runningeagle] by arguing that he had the more prominent role in the crimes.

Moreover, even had Tilden's attorney sought to place all the blame on Runningeagle, he was not denied an individualized sentencing determination. The trial court issued a carefully reasoned Special Verdict that separately addressed Runningeagle's conduct and background. That court presided over the trial of the case and heard all of the evidence, held sentencing hearings, and took additional evidence in the form of letters from the victims' family and friends, letters from the defendants' family and friends, letters from Runningeagle himself, three psychological reports from three separate psychologists, the State and defense sentencing memoranda, and the Pre-Sentence Report by the Probation Office. Had severance been granted, there is no indication that the trial court would have considered any different evidence or reached any other decision.

Moreover, the sentencing court was fully aware of its responsibility to impose individualized sentences. At the sentencing hearings, the trial court stated it was "very mindful of the constitutional requirement to individualize and to individually determine all sentencings," noting that this was particu-

larly true in capital cases. After sentencing Runningeagle and turning to Tilden, the court again mentioned that it was "mindful of the need to individualize the sentences." Shortly thereafter, declining to impose death upon Tilden, the court observed that it had been "reminded over and over by the death penalty cases" it had reviewed that it was "bound and mandated by our Constitution and by justice to individualize the sentences and to consider and take into account not only the circumstances of the offense, but the character and propensities of each of the offenders." The court added that "this required not only a comparison of the actions and degree of participation of each defendant, but a comparison of their characters, backgrounds, and propensities. In making this comparison I find significant and considerable differences."

Both the hearing transcripts and the Special Verdict demonstrate that the trial court understood the different levels of culpability of, and separately considered the aggravating and mitigating evidence for, each defendant. The trial court found that Runningeagle played the lead role in the murders and was incapable of feelings such as remorse. Runningeagle may disagree with these findings, but having a separate sentencing proceeding would not have changed them. Moreover, the court took great pains to explain why she imposed only a sentence of life imprisonment upon Tilden, instead of the death sentence imposed upon Runningeagle. Noting that there were "significant and considerable differences" in the characters, backgrounds, and propensities of the two defendants, the trial court stated that it had "not used these differences in aggravating circumstances against Defendant Running Eagle, but have only used them in considering the mitigating circumstances" relevant to Tilden. The judge further explained the differing roles they played in the murders:

> The Court must consider the degree of participation by Defendant Tilden in these brutal murders. There is no doubt that Defendant Tilden acted brutally in the manner and strength with which he struck Mrs.

Williams, and there is also no doubt that he struck Mr. Williams. However, there is no evidence to indicate Defendant Tilden inflicted any of the horrendous stab wounds. All of the evidence presented pointed to Defendant Running Eagle who owned the survival knife, whose palmprint was found in the laundry room above the bloody bodies. It was the Defendant Running Eagle who initiated the cruising, was involved in the removal of the scoop and the carburetors when Mr. Williams first confronted the defendants. The evidence points to Defendant Running Eagle as the intelligent, charismatic leader that younger cousin Defendant Tilden followed.

**[14]** Addressing a similar ineffective assistance claim by an Indiana defendant who argued that his counsel should have moved for severed sentencing proceedings, the Seventh Circuit found that there was no prejudice where, despite the habeas petitioner's "contentions, there is no evidence that in a separate proceeding, the . . . judge would have balanced the aggravating and mitigating factors differently." *Rastafari v. Anderson*, 278 F.3d 673, 691 (7th Cir. 2002). We agree with this approach, and similarly find that there is no evidence that the sentencing court would have balanced the aggravating and mitigating factors differently had the defendants been afforded separate sentencing proceedings.

## VI.

Runningeagle argues that the Arizona Supreme Court unreasonably rejected his claim that statements made by the prosecution violated his right to due process. In his opening statement, the prosecutor declared:

What happened in the next 10, 15, 20 minutes [after Runningeagle began stealing pieces of the car] can only be described as unspeakable horror. It was evil. What happened in that next 10, 15, 20 minutes ended

everything for Jackie and Herbert Williams. And the cause and the reason that it ended is right here in the courtroom. The evil is among us.

*Runningeagle*, 859 P.2d at 173-74. Runningeagle objected to these statements, and the trial court sustained the objection, but denied Runningeagle's subsequent motion for a mistrial. *Id*. In his petition for post-conviction relief, Runningeagle argued that these statements were "an appeal to passion and prejudice," and that he was entitled to a new trial. *Id.* Denying Runningeagle's petition, the Arizona Supreme Court held that while the prosecutor's words constituted argument, and thus were objectionable, the argument was "merely a characterization of the evidence" rather than an appeal to passion or prejudice. *Id.* Runningeagle contends that, contrary to the Arizona Supreme Court's conclusion, these comments were directed toward his character rather than to the nature of the crimes, and therefore infected his trial with unfairness, as the jury heard these comments before hearing the evidence.

Runningeagle might well be correct about the true import of the prosecutor's comments. *But see Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."). Even if the Arizona Supreme Court unreasonably viewed all of the prosecutor's comments as characterizations of the evidence rather than characterizations of the defendants, however, to prevail on habeas review under *Richter*, Runningeagle must demonstrate that any "arguments or theories . . . [that] could have supported" the state court's ultimate decision—here, its determination that the prosecutor's remarks did not violate Runningeagle's due process right to a fair trial—would have been an unreasonable application of clearly established federal law. *See Richter*, 131 S. Ct. at 786. Because the trial court sustained Runningeagle's objection and repeatedly instructed

the jury that the attorneys' arguments were not evidence, and because the weight of the evidence against Runningeagle was substantial, Runningeagle cannot do so.

**[15]** "Improper argument does not, per se, violate a defendant's constitutional rights." *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002) (quoting *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996)). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). Rather, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id.* (quoting *Donnelly*, 416 U.S. at 643). In *Darden*, during closing, the prosecutor referred to Darden as an "animal," and said that he should not be allowed out of a cell unless he was on a leash and that he wished that he could see Darden "sitting here with no face, blown away by a shotgun." *Id.* at 181-83 nn.11 & 12. Nevertheless, the Court found that these improper statements did not deprive Darden of a fair trial, in part because of the substantial evidence against Darden, and because the trial court instructed the jury that the arguments made by counsel were not evidence. *See id.* at 181-83; *see also Donnelly*, 416 U.S. at 645 (finding that an improper statement by a prosecutor during closing argument did not amount to a due process violation in part because the judge instructed the jury that the remark was not evidence); *Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (finding that prosecutorial misconduct did not amount to a due process violation where the trial court gave an instruction that the attorneys' statements were not evidence and where the prosecutors presented substantial evidence of the defendant's guilt).

**[16]** The trial judge sustained Runningeagle's objection to the improper statements. Just as in *Donnelly* and *Darden*, moreover, the trial court repeatedly instructed the jury regarding the nature of the attorneys' arguments. Both before open-

ing statements and after the close of the trial, the court instructed the jurors that what the attorneys said in opening was not evidence, that they should decide the case only on the evidence, and that they should not be influenced by sympathy or prejudice. Again as in *Darden*, 477 U.S. at 181-83, the evidence against Runningeagle was substantial, and included, among other things, his palm print on the clothes dryer next to the Williamses' bodies and his own statements about the crimes. *Runningeagle*, 859 P.2d at 171-72. The Arizona Supreme Court's determination that the prosecutor's comments, while improper, did not amount to a due process violation, was therefore not an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d). That the Arizona Supreme Court did not cite to either *Donnelly* or *Darden*, the most relevant Supreme Court opinions, is immaterial. *See Richter*, 131 S. Ct. at 784 ("And as this Court has observed, a state court need not cite or even be aware of our cases under § 2254(d).") (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)).

## VII.

We therefore affirm the district court's denial of Runningeagle's habeas petition and request for an evidentiary hearing.

**AFFIRMED.**[12]

---

[12]We address Runningeagle's March 26, 2012 motion for a limited remand of issues not before us in an order filed concurrently with this opinion.

PREGERSON, Circuit Judge, concurring in part and dissenting in part:

"A rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."
*Banks v. Dretke*, 540 U.S. 668, 696 (2004).

In the early morning hours of December 6, 1987, in Phoenix, Arizona, two teenagers committed a horrible and senseless crime. Petitioner Sean Bernard Runningeagle and his co-defendant, Corey Tilden, burglarized the home of Herbert and Jacqueline Williams. Herbert and Jacqueline Williams were present at the time of the burglary, and, in the course of the burglary, one of these two teenagers stabbed and killed the Williamses.

Runningeagle and Tilden were tried together in Maricopa County Superior Court. Both were convicted of two counts of first degree murder. At the sentencing hearing, the trial judge sentenced Tilden to life imprisonment but sentenced Runningeagle to death.[1] The judge's decision to spare Tilden's life was based primarily on the judge's view that it was Runningeagle who stabbed the victims. What the trial judge did not have before her, and indeed no court has ever had before it, are the statements Tilden made about his role in the murders to his cellmate, Manuel Melendez. Prosecutors and police spoke with Melendez *five times* in the weeks leading up to Runningeagle's trial, but never provided Melendez's potentially exculpatory statements to Runningeagle.

---

[1]Prior to the Supreme Court's decision in *Ring v. Arizona*, trial judges in Arizona determined mitigating and aggravating circumstances and decided whether a death sentence should be imposed. 536 U.S. 584, 589 (2002). In *Ring*, the Supreme Court held that this procedure violated the Sixth Amendment's Right to a Trial by Jury. *Id. Ring*, however, is not retroactive to cases on federal habeas review. *Schriro v. Summerlin*, 542 U.S. 348, 358 (2007).

Runningeagle has diligently sought this information from prosecutors for more than twenty years, to no avail. On April 18, 1988, three months before trial, Runningeagle's counsel filed a motion requesting that prosecutors provide "all material or information which tends to mitigate or negate [Runningeagle's] guilt as to the offense charged, or which would tend to reduce [his] punishment therefor . . . ." Despite this request, the prosecution failed to provide Melendez's statements to Runningeagle.

In his state post-conviction review ("PCR") proceedings, Runningeagle raised a *Brady* claim and asked for access to the court's subpoena power and for an evidentiary hearing, so he could finally obtain Melendez's statements. But the state PCR court summarily denied Runningeagle's *Brady* claim, without first requiring prosecutors to disclose Melendez's statements. The court based its denial on Arizona Rule of Criminal Procedure 32.1(e), which requires the petitioner to establish that "[n]ewly discovered material facts probably exist and such facts *probably* would have changed the verdict or sentence." Ariz. R. Crim. P. 32.1(e) (emphasis added).

In his federal habeas proceedings, Runningeagle asked for discovery and an evidentiary hearing. Like the state PCR court, the district court denied Runningeagle's *Brady* claim without first requiring prosecutors to disclose Melendez's statements.[2] Runningeagle then appealed the district court's denial of habeas relief to our court.

---

[2]In the district court, Runningeagle made discovery requests for documents containing Melendez's statements from the police department, the county attorney's office, the sheriff's office, and the county jail. Runningeagle also requested that the court afford him the opportunity to depose investigators and detectives who had spoken with Melendez. The district court denied all of Runningeagle's discovery requests on the ground that Runningeagle was not "diligent" in attempting to develop the facts of his claim in state court, as required by 28 U.S.C. § 2254(e)(2). The district court's ruling was incorrect. Runningeagle was diligent in attempting to develop the factual basis of his claim in state court. Before the state

During oral argument before our court, counsel for the government acknowledged there may be a "Melendez File" containing exculpatory evidence that, to this day, has still not been disclosed to Runningeagle. Oral Argument Audio at 33:40-34:01; 36:28-37:44. The government attorney, however, took the remarkable position that Runningeagle was not entitled to this exculpatory information. Oral Argument Audio at 33:40-34:01; 36:28-37:44.

The majority opinion, like every court to have adjudicated Runningeagle's claims, denies Runningeagle's *Brady* claim without first requiring prosecutors to disclose Melendez's statements. Maj. Op. at 8257. In so holding, the majority opinion concludes that the state PCR court's denial of Runningeagle's *Brady* claim, without any discovery or evidentiary development, was not "contrary to" or an "unreasonable application" of clearly established federal law under 28 U.S.C. § 2254(d)(1). Maj. Op. at 8245-46. The majority opinion further concludes that, under *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), Runningeagle is not entitled to discovery of Melendez's statements. Maj. Op. at 8257.

In my view, the state PCR court's use of "probably would have changed the verdict or sentence" as a standard for *Brady* materiality was "contrary to" clearly established Supreme Court case law. Under clearly established Supreme Court case law, the standard for materiality under *Brady* is whether

PCR court, Runningeagle raised a *Brady* claim and requested an evidentiary hearing. He also asked for access to the PCR court's subpoena power, and attached supporting documents to his PCR Petition. Runningeagle's attempts to develop the record before the state PCR court were more than sufficient to satisfy 2254(e)(2)'s diligence requirement. *See Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010) ("A petitioner who has previously sought and been denied an evidentiary hearing has not failed to develop the factual basis of his claim and therefore satisfies § 2254(e)(2)."); *West v. Ryan*, 608 F.3d 477, 484-85 (9th Cir. 2010) (same).

"there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome, but is less than the preponderance more-likely-than-not standard. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Because Runningeagle has satisfied § 2254(d)(1)'s "contrary to" clause, we must review Runningeagle's *Brady* claim "without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Under this de novo review, I would remand to the district court for discovery on Runningeagle's sentencing-phase *Brady* claim. In my view, Runningeagle has established "good cause" for discovery under Rule 6(a) of the Rules Governing § 2254 Cases.[3]

## AEDPA's FRAMEWORK

Because Runningeagle is a state prisoner challenging his conviction and death sentence in federal court, the strictures of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") apply to his claim. *See* 28 U.S.C. § 2254; *Lindh v. Murphy*, 521 U.S. 320 (1997). The AEDPA provides, in pertinent part, that a state prisoner may not obtain federal habeas relief for any claim "adjudicated on the merits" by a state court unless he can show that the state court's adjudication of his claim:

> resulted in a decision that was contrary to, *or* involved an unreasonable application of, clearly

---

[3]Like the majority, I would affirm the district court's denial of habeas relief on Runningeagle's *guilt-phase Brady* claim. The evidence of Runningeagle's guilt was overwhelming. Accordingly, Runningeagle cannot establish "a reasonable probability that, had the evidence been disclosed to the defense, the result of the [guilt-phase] would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). I also concur in the majority's resolution of Runningeagle's non-*Brady* claims.

established Federal law, as determined by the Supreme Court of the United States . . .

28 U.S.C. § 2254(d)(1) (emphasis added). This section contains two independent clauses: a "contrary to" clause and an "unreasonable application" clause. *See Terry Williams v. Taylor*, 529 U.S. 362, 404 (2000). A state prisoner is not required to satisfy both clauses of Section 2254(d)(1). *Terry Williams*, 529 U.S. at 404-05. He need only show that the state court's decision was "contrary to" federal law, *or*, an "unreasonable application" of federal law. *Id.*

A.    *The "Contrary To" Clause*

A state court's "use of the wrong legal rule or framework [ ] constitute[s] error under the 'contrary to' prong of § 2254(d)(1)." *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008) (en banc); *see also Price v. Vincent*, 538 U.S. 634, 640 (2003) (holding that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases.") (internal marks omitted). In *Terry Williams*, the Supreme Court gave the following example of a state court decision that would be "contrary to" clearly established federal law:

> A state court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. Take, for example, our decision in *Strickland v. Washington*. If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be [contrary to] our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a

> "reasonable probability that . . . the result of the pro-
> ceeding would have been different."

529 U.S. at 405-06 (internal citations omitted). In the context of a *Brady* claim, our court has held that a state court's use of the wrong standard for assessing materiality will result in a decision that is "contrary to" clearly established federal law. *See Bailey v. Rae*, 339 F.3d 1107, 1118 (9th Cir. 2003) (holding that the state court's use of a "probably change the result" standard for materiality was "contrary to" clearly established federal law).

## B.    The "Unreasonable Application" Clause

A state court's decision will constitute an unreasonable application of clearly established federal law if the "state court's application of clearly established federal law was objectively unreasonable." *Terry Williams*, 529 U.S. at 409.

In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Supreme Court discussed use of the "unreasonable application" clause when a state court issues a summary denial on the merits. The Court explained that, when a state court issues a summary denial on the merits, the "unreasonable application" clause requires that:

> [A federal habeas court] determine what arguments
> or theories supported or, as here, could have sup-
> ported, the state court's decision; and then it must
> ask whether it is possible fairminded jurists could
> disagree that those arguments or theories are incon-
> sistent with the holding in a prior decision of this
> Court.

*Richter*, 131 S. Ct. at 786. The Court then held that, if fair-minded jurists could disagree with the hypothetical arguments generated by the federal habeas court, then the state court's

summary denial will not be an "unreasonable application" of clearly established federal law. *Id.*

## C.    *De Novo Review in Federal Court*

If a state prisoner is able to satisfy Section 2254(d)(1)'s "contrary to" clause *or* its "unreasonable application" clause, the federal habeas court must then review the state prisoner's claim de novo. *Frantz*, 533 F.3d at 735; *see also Lafler v. Cooper*, No. 10-209, ___ S. Ct. ___, 2012 WL 932019, at *11 (2012) (reviewing habeas petitioner's ineffective assistance claim de novo after finding that state court's adjudication of the claim was "contrary to" clearly established federal law); *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (holding that, when the requirement set forth in § 2254(d)(1) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires.").

With AEDPA's framework in mind, and with an understanding that this framework was designed to limit and restrict a federal court's ability to issue the Great Writ in criminal matters originating in state courts, it is time to consider whether Runningeagle is entitled to discovery on his *Brady* claim.

## DISCUSSION

## I.    The State PCR Court's Denial of Runningeagle's *Brady* Claim Was "Contrary To" Clearly Established Federal Law Because the State PCR Court Applied the Wrong Standard for Assessing Materiality Under *Brady*

Under Section 2254(d)(1)'s "contrary to" clause, a state court's "use of the wrong legal rule or framework [ ] constitute[s] error . . . ." *Frantz*, 533 F.3d at 734; *see also Price*, 538 U.S. at 640. Here, the state court's use of the wrong legal

standard for assessing materiality under *Brady* was "contrary to" clearly established federal law.

Under clearly established Supreme Court case law, the standard for materiality under *Brady* is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome, but is less than the preponderance more-likely-than-not standard. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see also Bagley*, 473 U.S. at 678. This "reasonable probability" standard was not the standard employed by the state PCR court.

The state PCR court denied Runningeagle relief on his *Brady* claim, as well as further evidentiary development on the *Brady* claim, based on Arizona Rule of Criminal Procedure 32.1(e). Rule 32.1(e) provides for relief when "newly discovered material facts probably exist and such facts *probably* would have changed the verdict or sentence." (emphasis added). This standard mirrors the standard under Rule 33 of the Federal Rules of Criminal Procedure for granting a new trial based on newly discovered evidence. *See United States v. George*, 420 F.3d 991, 1000 (9th Cir. 2005) (noting that a new trial under Rule 33 requires that the new evidence "would *probably* result in acquittal") (emphasis added).[4]

---

[4]The majority takes inconsistent positions on whether the state PCR court reached the merits of Runningeagle's *Brady* claim. First, the majority contends that Runningeagle's *Brady* claim is not procedurally defaulted because the state PCR court reached the merits of Runningeagle's *Brady* claim and denied Runningeagle relief on *Brady* materiality grounds rather than on one of the state law procedural grounds listed in Rule 32.1(e). Maj. Op. at 8249. Several pages later, however, the majority contends that the state PCR court's use of an erroneous materiality standard was not "contrary to" clearly established federal law because the state PCR court could have denied Runningeagle relief based on one of the state law procedural grounds listed in Rule 32.1(e). Maj. Op. at 8253 n.5

The state PCR court's use of a "*probably* would have changed the verdict or sentence" standard for determining materiality under *Brady* was contrary to clearly established Supreme Court case law. The Supreme Court has explained time and time again that the test for materiality under *Brady* is less onerous than the standard for obtaining a new trial under Rule 33 of the Federal Rules of Criminal Procedure. In *United States v. Agurs*, 427 U.S. 97 (1976), the Supreme Court held that, under *Brady*:

> [T]he defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence *probably* would have resulted in acquittal. If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.

*Agurs*, 427 U.S. at 111 (emphasis added). *See also Bagley*, 473 U.S. at 680-81 ("The standard of materiality applicable in the absence of a specific *Brady* request is therefore stricter than the harmless-error standard but *more lenient to the*

---

(contending that the state PCR court could have denied relief based on Rule 32.1(e)'s procedural requirement that evidence be "newly discovered"). I agree with the first proposition put forth by the majority: that the state PCR court reached the merits of the *Brady* claim and denied relief on the merits rather than one of the state law procedural grounds listed in Rule 32.1(e). Where, as here, a state court decision is interwoven with federal law and "the adequacy and independence of any possible state law ground is not clear from the face of the [state court] opinion, [the federal court] will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." *Florida v. Powell*, 130 S. Ct. 1195, 1201-02 (2010) (internal quotation marks omitted) (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).

*defense than the newly-discovered-evidence standard*.") (emphasis added).

Our court has previously held that a state court's use of the wrong standard for assessing materiality under *Brady* will result in a state court decision that is "contrary to" clearly established federal law. In *Bailey v. Rae*, 339 F.3d 1107 (9th Cir. 2003), our court reviewed a state court denial of a *Brady* claim where the state court required the petitioner to show the evidence suppressed "be such as will *probably* change the result if a new trial is granted." *Id*. at 1118 (emphasis added) (internal quotation marks omitted). In finding that the state court decision was "contrary to" clearly established Supreme Court case law, our court explained that:

> The steep hurdle set by the state court runs contrary to the materiality test that has been set out by the Supreme Court. In *Bagley*, the Court explained that evidence is material if there is a "reasonable probability" that a different outcome would have occurred had the evidence been disclosed, meaning that there was a "probability sufficient to undermine confidence in the outcome." The Court, in arriving at the standard, made a point of distinguishing the stricter "newly discovered evidence" standard of the type applied by the Oregon state court.

*Id*. (internal citations omitted). Here, as in *Bailey*, the steep hurdle set by the state PCR court runs "contrary to" clearly established federal law. *See also Terry Williams*, 529 U.S. at 405-06 (noting that a state court's use of the wrong standard in assessing prejudice under *Strickland* would be an example of a state decision "contrary to" clearly established Supreme Court case law).[5]

---

[5]The Supreme Court's decision in *Richter* does not affect analysis under the "contrary to" clause of § 2254(d)(1). *Richter* concerned § 2254(d)(1)'s "unreasonable application" clause, not the "contrary to" clause. *See Richter*, 131 S.Ct. at 785 ("The court of appeals lengthy opinion [ ] discloses an improper understanding of § 2254(d)'s *unreasonableness* standard . . . .") (emphasis added).

**II. Because Runningeagle has Satisfied Section 2254(d)(1)'s "Contrary To" Clause, Runningeagle's *Brady* Claim is Subject to De Novo Review in Federal Court**

Once a state prisoner satisfies Section 2254(d)(1)'s "contrary to" clause or its "unreasonable application" clause, the state prisoner's habeas claim is subject to de novo review in federal court. *See Panetti*, 551 U.S. at 953; *Frantz*, 533 F.3d at 735. Here, the state PCR court's denial of Runningeagle's *Brady* claim was "contrary to" clearly established federal law because the state PCR court applied the wrong standard for assessing materiality under *Brady*. Accordingly, Runningeagle's claim is subject to de novo review because he has satisfied Section 2254(d)(1)'s "contrary to" clause.

**III. *Pinholster* Does Not Bar Further Evidentiary Development for Habeas Claims Subject to De Novo Review**

The majority relies on the Supreme Court's recent decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), for the proposition that Runningeagle is not entitled to discovery in federal court. Maj. Op. at 8257. *Pinholster*, however, does not apply to Runningeagle's *Brady* claim because Runningeagle's *Brady* claim is subject to de novo review.

In *Pinholster*, the Supreme Court held that a federal habeas court's "review under § 2254(d)(1) is limited to the record that was before the state court . . . ." 131 S. Ct. at 1398. *Pinholster*, however, did not address what happens *after* a habeas petitioner has overcome the limitation of § 2254(d)(1). Indeed, the Supreme Court has held that, once a petitioner has satisfied § 2254(d)(1) "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires." *Panetti*, 551 U.S. at 953; *see also Frantz*, 533 F.3d at 735.

Here, as discussed above, Runningeagle's claim is subject to de novo review because he has satisfied Section

2254(d)(1)'s "contrary to" clause. It is under this de novo review that a state prisoner can receive discovery in federal court.

**IV. Runningeagle is Entitled to Discovery on his Sentencing-Phase *Brady* Claim**

The majority concludes that discovery of Melendez's potentially exculpatory statements is unnecessary because there is no "reasonable probability" that Runningeagle would have received a life sentence had Melendez implicated Tilden as the stabber. Maj. Op. at 8253. This is so, the majority contends, because "the likely result of further inculpation of Tilden was a *death sentence for Tilden* and not a life sentence for Runningeagle." Maj. Op. at 8254 (emphasis added). I respectfully disagree for the following reasons.

> *A. The Majority Incorrectly Applies the Standard for a Ruling on the Merits Instead of the Standard for Discovery Under Rule 6(a) of the Rules Governing § 2254 Habeas Cases*

First, the majority does not address the relevant legal standard for granting discovery in a habeas proceeding. Under the applicable standard, a habeas petitioner is entitled to discovery under Rule 6(a) of the Rules Governing § 2254 Cases when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ." *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)). Our court has also held that discovery should be authorized under Rule 6(a) "when discovery [is] essential for the habeas petitioner to develop fully his underlying claim." *Pham*, 400 F.3d at 743 (internal marks omitted); *see also Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997) (authorizing discovery because it was "essential" for the habeas petitioner to "develop fully" his underlying claim). Thus, to obtain discovery,

a habeas petitioner is not required to conclusively establish entitlement to relief. To obtain discovery, the habeas petitioner need only show that he "may, if the facts are fully developed, be able to demonstrate that he is entitled to relief," *Pham*, 400 F.3d at 743 (internal marks omitted), or that discovery is "essential" to develop the underlying claim. *Id.*

Here, there is reason to believe that Runningeagle may, if the facts are fully developed, be able to demonstrate that he is entitled to relief on his sentencing-phase *Brady* claim. *Bracy*, 520 U.S. at 908-09. Runningeagle has alleged that the prosecution withheld documents detailing statements co-defendant Tilden made to Melendez about Tilden's role in the murders. The trial judge's decision to spare co-defendant Tilden from a death sentence was based, in large part, on the trial judge's view that Runningeagle was the one who inflicted the stab wounds. Thus, statements from Melendez that implicated Tilden as the stabber would be crucial mitigating evidence for Runningeagle.

Moreover, the government did acknowledge during oral argument before our court that there may be a "Melendez File" containing exculpatory evidence that was never turned over to the defense. Oral Argument Audio at 33:40-34:01; 36:28-37:44. In these circumstances, discovery of exculpatory information in the "Melendez File" is "essential" for Runningeagle to "develop fully" his sentencing-phase *Brady* claim. *See Pham*, 400 F.3d at 743.

###### B.    The Evidence that Runningeagle was the Stabber Was Not "Overwhelming"

Next, the majority contends that Runningeagle is not entitled to discovery of Melendez's statements because "[n]othing that Melendez said could have blunted the overwhelming evidence that Runningeagle did the stabbing" and that there is "no basis in the evidence" to conclude that Tilden may have been the stabber. Maj. Op. 8254. I agree with the majority

insofar as there was "overwhelming" evidence that Runningeagle *and Tilden* entered the Williams' home, that Runningeagle *and Tilden* committed first-degree burglary, and that Runningeagle *and Tilden* were guilty of first-degree murder. But I disagree that there was "overwhelming" evidence that it was Runningeagle, and not Tilden, who stabbed the victims. The evidence that Runningeagle was the stabber was far from compelling.

The trial judge's view that it was Runningeagle, and not Tilden, who stabbed the victims, apparently came from three items of evidence:

**1. The Palmprint:** Runningeagle's palmprint was found on a dryer inside the Williams' home.

**2. The Knife:** Runningeagle owned a large survival knife that was similar to the type of knife used to kill the victims.

**3. Co-Defendant Orva Antone's Testimony:** Co-Defendant Orva Antone struck a deal with the prosecution and agreed to testify for the prosecution in exchange for the prosecution dismissing murder charges against him. On direct examination, Antone testified that he witnessed *Tilden* strike Ms. Williams with a flashlight and observed Runningeagle "tease" Mr. Williams with a knife. Antone, however, also testified that both *Tilden* and Runningeagle entered the Williams' home, and that he did not see whether it was Tilden or Runningeagle who inflicted the stab wounds. On cross-examination, Antone admitted that he was intoxicated at the time of the murders, that he originally told police that he didn't remember anything about the murders because he was drunk, that he only knew that the Williamses were stabbed because police detectives told him, and that detectives told him that Runningeagle was the stabber.

Given this record, statements from Melendez that implicated Tilden as the stabber could have raised enough doubt in the trial judge's mind about the identity of the stabber so as to warrant sparing Runningeagle's life.

To be sure, Melendez, like Antone, had credibility problems. Melendez was a jailhouse informant and Antone was an accomplice in the murders. *See* Hon. Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1383-85 (1996) (noting that accomplices, co-conspirators, snitches, and informers make for a "not-so-reliable" witness). But there is no reason to think that the trial judge would give greater weight to the testimony of a murder accomplice who struck a deal with the prosecution than the testimony of a jailhouse informant.

Indeed, perhaps the most perplexing aspect of the majority opinion is its inconsistent treatment of Melendez's credibility. First, the majority opinion contends that, had Melendez testified that Tilden was the stabber, such testimony was unlikely to be believed because a jailhouse informant is a "notoriously unreliable source." Maj. Op. at 8251. But three paragraphs later, the majority opinion contends that the trial judge would have *sentenced Tilden to death* based on Melendez's testimony. Maj. Op. at 8254. Which is it? Was Melendez, as the majority opinion claims, so reliable and trustworthy that the trial judge would have *sentenced Tilden to death* based on Melendez's statements? Or was Melendez, as the majority opinion also claims, so unreliable that his testimony could not have affected Runningeagle's sentence?

### C. *The Majority Misapplies* Brady's *Materiality Standard*

Finally, the majority mischaracterizes the relevant inquiry for determining materiality under *Brady*. The majority mistakenly presumes that there is not a "reasonable probability" of a life sentence for Runningeagle because evidence showing that Tilden was the stabber would have *only* resulted in a

death sentence for Tilden. Maj. Op. at 8254. While it is certainly possible that testimony implicating Tilden as the stabber could have resulted in a death sentence for Tilden, it is also reasonably probable that such testimony could have resulted in a life sentence for Runningeagle. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 393 (2005) ("[A]lthough we suppose it is possible that [the sentencer] could have heard it all and still have decided on the death penalty, that is not the test."). Under *Brady's* materiality standard, the relevant inquiry is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome, but is less than the preponderance more-likely-than-not standard. *Kyles*, 514 U.S. at 434.

Testimony from Melendez implicating Tilden as the stabber would be just the sort of powerful "lingering doubt" evidence that we have repeatedly described as an "extremely effective argument" for defendants in the sentencing phase of a capital case. *Lockhart v. McCree*, 476 U.S. 162, 181 (1986); *see also Cox v. Ayers*, 613 F.3d 883, 898 (9th Cir. 2010) (same); *Williams v. Woodford*, 384 F.3d 567, 624 (9th Cir. 2004) (same). Indeed, we have repeatedly relied on a comprehensive study of opinions of jurors in death penalty cases that concluded that " 'the best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence . . . . The best thing he can do, all else being equal, is to raise doubt about his guilt.' " *Williams*, 384 F.3d at 624 (quoting Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998)). *See also Cox*, 613 F.3d at 898 (noting significance of defense counsel's penalty-phase "non-shooter" theory). Here, statements from Melendez that implicated Tilden as the stabber could have raised enough doubt in the trial judge's mind about the identity of the stabber so as to warrant sparing Runningeagle's

life. At a minimum, the question is close enough that Runningeagle is entitled to discovery of Melendez's statements. *See Pham*, 400 F.3d at 743.

## CONCLUSION

The majority is content to resolve Runningeagle's sentencing-phase *Brady* claim without first requiring prosecutors to disclose Melendez's statements. Because I would require the prosecution to turn over all exculpatory material to Runningeagle, I respectfully dissent.