Filed 7/2/14  P. v. Comphel CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C064487 |
| Plaintiff and Respondent, | (Super. Ct. Nos. TF035659A, TF035659C) |
| v. | |
| JOHN CLAUDE COMPHEL et al., | |
| Defendants and Appellants. | |

Defendants John Claude Comphel and David Paul Sconce, Jr., appeal after each was convicted of one count of assault with a deadly weapon, a knife, or force likely to produce great bodily injury.  (Pen. Code, § 245, subd. (a)(1).)[1]  The jury found not true a hate crime enhancement allegation.  (§ 422.75, subd. (a).)

On appeal, defendants contend the trial court erred in (1) denying their request that the prosecutor contact local and out-of-county law enforcement agencies to determine

---

[1] Undesignated statutory references are to the Penal Code.

1

whether the victims were gang affiliated and disclose the results of that inquiry, (2) allowing the prosecutor to argue to the jury that the defense failed to prove the victims were gang members, (3) failing to instruct the jury sua sponte on simple assault (§ 240) as a lesser included offense, and (4) failing to instruct sua sponte that the jury must consider each defendant separately (CALCRIM No. 203).

We conclude that the prosecution did not violate defendants' constitutional discovery rights and that defendants forfeited their belated statutory discovery violation claims. We also reject defendants' claims of prosecutorial misconduct in closing argument. As for the claims of instructional error, we agree that the trial court erred. However, the trial court's decision to not instruct on the lesser included charge of simple assault was invited error. The error in failing to instruct the jury to consider each defendant separately was harmless.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Comphel wielded a knife and defendant Sconce wielded a box-cutter-like knife during an altercation they and others in their group instigated at McDonald Park in Tracy.

Defendants were charged with one count of assault by means of force likely to produce great bodily injury or with a deadly weapon involving two victims.[2] (§ 245, subd. (a)(1).) As to both defendants, the amended information also alleged an enhancement for a hate crime under section 422.75, subdivision (a). The amended information also charged a third defendant, Heather Ann Sisco, but after the prosecution's case-in-chief, the trial court granted her section 1118.1 motion for a judgment of acquittal.

---

[2] Instead of alleging two counts, one for each victim, the prosecution filed a single count alleging two victims.

2

On August 10, 2009, the victims, T.N. and his 15-year-old brother K.W., were at McDonald Park in Tracy with friends D.R., C.P., and D.P., sitting on a park bench, talking and listening to iPods. It was D.R.'s birthday. All of the members of this group are African-American.

T.N. left the park briefly, passing defendants and two girls. Comphel asked T.N. if he "needed anything," which T.N. took to mean drugs, and T.N. responded, "I'm all right. I don't even do that."

After T.N. returned to his friends on the park bench, defendants' group walked past the bench, and a girl in defendants' group yelled out, "White power." C.P. retorted, "Black power." The girl in defendants' group threatened to hurt C.P., who got mad and retorted, "[y]ou can try." T.N., concerned that the other girl was much older than C.P. (who was 13 or 14), said, "This is a young girl."[3] T.N. said if the older girl touched his friend, he would have his sister "hop on her."

The victims testified that Comphel (identified at trial by both T.N. and K.W.) pulled out a knife and began waving it in a slicing motion, challenging T.N. An altercation ensued in which Comphel used his knife and Sconce used what was later determined to be a box-cutter-type instrument to assault both T.N. and K.W., who defended themselves with pieces of fence from a nearby yard.

A nearby resident called the police. A police officer contacted Comphel about a block and a half from the park and found a knife with a wooden-like grip in Comphel's pants pocket.

Another officer contacted Sconce a distance he approximated as no more than a half mile from the park. Sisco was with Sconce. The officer retrieved an X-Acto-type knife or box cutter from Sconce's pocket.

---

[3] The age of the older girl in defendants' group is unknown, but Comphel was 29 and Sconce was 25.

T.N. sustained a knife wound to his arm, which he described as "pretty much a slice, but it was nothing deep. It was just, like, it grazed me." Neither victim required medical attention. At trial, the victims denied being gang members. T.N. denied saying they were in a gang during the encounter with defendants. K.W. was not asked about whether he made any such statement.

The defense confronted the victims with photographs from T.N.'s MySpace social networking Web page in which both victims are depicted throwing hand signs and T.N. is holding a marijuana "blunt" and a BB gun. Each victim admitted a prior conviction for possession of stolen property. T.N. testified that the BB gun in the MySpace photo was the stolen property underlying his conviction. He testified that the hand signs indicated places where they lived; the gestures were not gang signs. He held up a "B" for Berkeley. His cousin held up a "W," which signified West Berkeley. His brother held up a sign that indicated East Palo Alto, and someone else held up a sign that indicated Oakland. T.N. explained that the people in the photos were blood related, not gang members. T.N. said one of the hand signs he held up was a peace sign. Another stood for Fresh Boyz, a name he, his brother, and a few friends called themselves in elementary school. According to K.W., Fresh Boyz was a group of friends that "dance and stuff." T.N. said he makes hip-hop music, and he described the hand signs as a "hip-hop thing." T.N. described these photographs as just having fun. T.N. also testified that he had close to 100 photos on his MySpace page, which included photos of his father, his father's former fiancée, photos from a school activity, and photos of him performing at a party.

Defendants did not testify.

The jury found each defendant guilty of one count of "assault with a deadly weapon or force likely to produce great bodily injury." The jury found the hate crime enhancement "not true" as to each defendant.

The trial court sentenced each defendant to the lower term of two years.

4

## DISCUSSION

### I.  Discovery Violation Claim

Defendants contend[4] that the trial court erred in denying a defense request to order the prosecutor to contact local and out-of-county police agencies to determine whether the victims were gang members and to disclose the results of that inquiry.  Defendants claim a violation of federal due process and state statute governing criminal discovery. (*Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*); § 1054.1, subd. (e).) We conclude there was no constitutional violation and defendants forfeited their statutory claim by failing to assert it in their opening briefs on appeal.

### A.  Background

On the day of jury selection, for the first time, Comphel's counsel complained to the trial court that he had not received a response to a letter he had sent only two weeks earlier, asking the prosecution to investigate and disclose whether the victims were members of a criminal street gang anywhere.

The request was based on a claim by codefendant Heather Sisco that, during the fight, one of the victims said he was a member of South Side Oakland, a purported criminal street gang.  The record does not reveal to whom and when Sisco made that claim.  Counsel stated that his request was for information "from any law enforcement agency considering this particular issue."[5]  The prosecutor admitted to the trial court, ". . . I didn't even look into it.  I'm not going to take Miss Sisco's word for what's going on with my victims."  The prosecutor told the court he had no information the victims were gang members, and he considered defendant's request overbroad since it included "Any law enforcement."

---

[4]  Sconce joined in all of Comphel's arguments in the opening brief.

[5]  The record does not include a copy of the letter counsel sent to the prosecutor in which the request was made.

The trial court, while cautioning the prosecutor about ignoring discovery requests,[6] noted this was not a gang case and ruled that the prosecutor was not required to investigate gang membership in another county. The court also ruled that the request was untimely. The court further ruled that the defense could introduce evidence that the victim said he was in a gang, but whether the defense could put on evidence about whether the victims were in fact in a gang was "an open question."

Counsel for Comphel said he could try calling law enforcement agencies in other counties but did not expect them to give a defense attorney "the time of day." The trial court ruled the prosecution was not required to make any further inquiry as to whether the victims were gang members. The record reflects no information about whether defense counsel actually made any inquiries on his own and, if so, what information was or was not provided. Neither defendant asserts that any request made to any agency was denied. The defense did not introduce any testimony indicating that the hand gestures depicted in the MySpace photographs were, in fact, gang signs. And the jury heard no evidence that the victims used any gang words during the incident.

## B. Constitutional Discovery Violation Claim

### 1. Duty to Inquire and Disclose

Defendants contend the prosecution had a constitutional duty to disclose exculpatory evidence and the failure to inquire into the existence of such evidence violated their due process rights.

The prosecution has a constitutional duty to disclose exculpatory information to the defense. (*Brady*, *supra*, 373 U.S. 83; *In re Sassounian* (1995) 9 Cal.4th 535, 543

---

[6] The court told the prosecutor he should have sought a protective order on the ground that the request was overbroad or, at least, sent opposing counsel a letter indicating he declined to investigate the information. The prosecutor acknowledged that he could have done that.

(*Sassounian*).) The *Brady* rule includes evidence known only to police investigators acting on the prosecution's behalf. (*Kyles v. Whitley* (1995) 514 U.S. 419, 437-438 [131 L.Ed.2d 490]; see *In re Brown* (1998) 17 Cal.4th 873, 879 & fn. 3 (*Brown*).) Thus, the *Brady* rule imputes to the prosecutor information known to police investigators involved in the case, and "[r]esponsibility for *Brady* compliance lies exclusively with the prosecution . . . ." (*Brown*, *supra*, 17 Cal.4th at p. 878.) In order to comply with *Brady*, therefore, " 'the individual prosecutor has a duty to learn of any favorable evidence known to the others *acting on the government's behalf in this case . . . .*' [Citation.]" (*Strickler v. Greene* (1999) 527 U.S. 263, 281 [144 L.Ed.2d 286] (*Strickler*), italics added; see also *People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*).) The duty to disclose materially favorable information to the defense is violated even if the prosecutor's failure to do so was negligent or inadvertent. (*People v. Kasim* (1997) 56 Cal.App.4th 1360, 1381.) "Whatever the reason for failing to discharge that obligation, the prosecution remains accountable for the consequence." (*Brown*, *supra*, 17 Cal.4th at p. 878, citing *Kyles*, *supra*, 514 U.S. at pp. 437-438.)

However, nothing in *Brady* or its progeny suggests that the prosecution must contact police agencies *not involved in the case* to determine the existence of exculpatory information, or that a prosecutor has a duty to disclose exculpatory information not otherwise known by the prosecutor but possessed by such agencies. In determining whether there has been a *Brady* violation, the focus is on police agencies that are part of the " ' " 'prosecution team' " ' " in the case. (*Brown*, *supra*, 17 Cal.4th at p. 879; see *People v. Jordan* (2003) 108 Cal.App.4th 349, 358-359.)

In *In re Steele* (2004) 32 Cal.4th 682, our high court discussed the prosecution's constitutional duty to disclose exculpatory evidence possessed by agencies that are part of the prosecution's team in the context of its analysis of section 1054.9, the statutory mechanism for obtaining posttrial discovery in death penalty and life-without-parole cases. The court wrote, "Thus, the [section 1054.9] materials include not only those the

prosecution itself possesses but those that law enforcement authorities possess. *The discovery obligation, however, does not extend to all law enforcement authorities everywhere in the world* but . . . only to law enforcement authorities who were involved in the investigation or prosecution of the case." (*Steele*, *supra*, 32 Cal.4th at p. 696, italics added.)  This reading of the statute, the court noted, is "consistent with the scope of the prosecution's constitutional duty to disclose exculpatory information.  'The scope of this disclosure obligation extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge "any favorable evidence known to the others *acting on the government's behalf . . . .*" '  [Citation.]  . . . But the prosecution cannot reasonably be held responsible for evidence in the possession of *all* governmental agencies, including those not involved in the investigation or prosecution of the case.  'Conversely, a prosecutor does not have a duty to disclose exculpatory evidence or information to a defendant unless the prosecution team actually or constructively possesses that evidence or information.  Thus, information possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the *prosecution team*, and the prosecutor does not have the duty to search for or to disclose such material.' "  (*Id.* at pp. 696-697, citing *People v. Superior Court* (*Barrett*) 80 Cal.App.4th 1305, 1315 (*Barrett*), first and second italics in original, third italics added; see also *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 903-904.)

In *People v. Zambrano* (2007) 41 Cal.4th 1082, during the guilt phase, defense counsel became aware of letters the defendant's sister had written to jail personnel.  The defense asserted that had those letters been produced sooner, a mental defense could have been investigated.  (*Id.* at pp. 1131, 1171.)  The defense contended the late disclosure violated *Brady*.  (*Zambrano*, at p. 1131.)  Our high court rejected the *Brady* claim, in part because the jail personnel were not part of the prosecution team.  The court wrote: "[T]he record does not show the sheriff's office was an agency subject to the statutory or

8

constitutional duty of disclosure. So far as appears, the sheriff was only defendant's jailer, and was not involved in the investigation or prosecution of the charges against him. [¶] Under *Brady*, the prosecutor's duty extends to evidence 'known to the others acting on the government's behalf' . . . ." (*Zambrano*, at p. 1133.)

Thus, because the prosecutor here was constitutionally required to search for and disclose only exculpatory evidence in the possession of a prosecution team agency (here, the Tracy Police Department), only that evidence, if it existed, could have been potential *Brady* material. Due process did not require that the prosecutor check with agencies that were not part of the prosecution team to determine whether there was evidence the victims were gang affiliated.

## 2. The Materiality Requirement

To establish a *Brady* violation, a defendant must show (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) that evidence was suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. (*Strickler*, *supra*, 527 U.S. at pp. 281-282; accord, *Salazar*, *supra*, 35 Cal.4th at p. 1043.)

Whether the suppression of evidence is prejudicial turns on the materiality of the information that has been withheld. (*Salazar*, *supra*, 35 Cal.4th at p. 1043; see also *Runningeagle v. Ryan* (9th Cir. 2012) 686 F.3d 758, 769 (*Runningeagle*) [" 'The terms "material" and "prejudicial" are used interchangeably in *Brady* cases' "].) The defendant has the burden of showing materiality. (*People v. Hoyos* (2007) 41 Cal.4th 872, 918 (*Hoyos*); *Sassounian*, *supra*, 9 Cal.4th at p. 545.)

Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*United States v. Bagley* (1985) 473 U.S. 667, 682 [87 L.Ed.2d 481]; see *Sassounian*, *supra*, 9 Cal.4th at p. 544.) It is a probability assessed

9

by considering the evidence in the context of all of the relevant circumstances and not in isolation or in the abstract. (*Sassounian*, at p. 544.) " 'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' [Citation.]" *Hoyos*, *supra*, 41 Cal.4th at p. 922; see *Sassounian*, *supra*, 9 Cal.4th at pp. 544-545.) Thus, " 'there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.' " (*Salazar*, *supra*, 35 Cal.4th at p. 1043.)

Here, defendants contend that the prosecutor failed to provide evidence its witnesses were gang members. To this, we ask, what evidence? Essentially, defendants ask us to speculate that such evidence exists and that the nature of the evidence was such that defendants were prejudiced. A necessary predicate to a finding that a prosecutor violated his or her obligation to disclose exculpatory evidence is the existence of specific exculpatory evidence. The *Brady* analysis requires that specific exculpatory evidence come to light. And the materiality of that evidence must be determined by considering the evidence in question under the totality of the relevant circumstances. (*Sassounian*, *supra*, 9 Cal.4th at p. 544.) Without specific exculpatory evidence to plug into the calculus, a defendant cannot establish that the result would have been different had the evidence been disclosed. Claims of materiality based on speculation that exculpatory evidence exists fail to establish materiality. (*Wood v. Batholomew* (1995) 516 U.S. 1, 5-6 [133 L.Ed.2d 1].)

This principle is illustrated in *Runningeagle*. In that case, the defendant sought federal habeas corpus relief for an alleged *Brady* violation. The defendant contended the prosecution had withheld evidence of a statement made to prosecutors by a cellmate of a codefendant in the charged murders. The defendant asserted that the codefendant *might have* told the cellmate that he committed the murders alone. Prior to the trial of the defendant and his codefendant, the cellmate had offered to testify for the prosecution in

10

exchange for a plea agreement in his own case. (*Runningeagle*, *supra*, 686 F.3d at pp. 766-767.) After the prosecutors spoke with the cellmate, they secured the testimony of another coperpetrator and told the cellmate they did not need his testimony. The cellmate subsequently entered into a plea agreement in his case unrelated to the murders, but later moved to withdraw his plea. (*Id.* at p. 767.) At his plea withdrawal hearing, the cellmate testified that he had gained information about the murders from the codefendant and shared that information with homicide detectives and prosecutors. The cellmate did not indicate what information he provided, and the prosecutors never provided the defendant with any information about what the cellmate had said. (*Id.* at pp. 767-768.) The cellmate died sometime after the defendant's trial. (*Id.* at p. 767.)

In rejecting the defendant's *Brady* claim, the Ninth Circuit reasoned: "[I]t cannot be known whether exculpatory or impeaching material exists, or whether it ever existed. As Runningeagle can only speculate as to what [the cellmate] told prosecutors, Runningeagle cannot demonstrate that [the cellmate's] statements were exculpatory or useful for impeachment, or that there is a reasonable probability that had [the cellmate's] statements been disclosed, the outcome of the trial or of the sentencing would have been different." (*Runningeagle*, *supra*, 686 F.3d at p. 771.)

Similarly, here we have been informed of no evidence that would have exculpated defendants. Consequently, defendants have no way of showing and we have no way of determining whether the disclosure of any such evidence would have made a different result probable. Any such claim can only be speculative, and speculation does not constitute reasonable probability. (*People v. Superior Court* (*Meraz*) (2008) 163 Cal.App.4th 28, 53, fn. 12.) Accordingly, we reject defendants' constitutional discovery violation claims.

### C. Statutory Discovery Violation Claim

Section 1054.1, subdivision (e) provides, in pertinent part: "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following

11

materials and information, *if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies*: [¶] . . . [¶] (e) Any exculpatory evidence." (Italics added.)

At trial, defense counsel never stated specific grounds for the assertion that the prosecutor had an obligation to determine whether the victims were gang affiliated and to provide them with that information. Indeed, it was the trial court that mentioned *Brady*, and no one claimed a statutory discovery violation.[7]

On appeal, Comphel does not specifically argue a violation of the prosecution's statutory obligations in his opening brief. Argument in his opening brief is limited to a claim that his due process rights were violated.[8] With no statutory claim made below and

---

[7] The only reference to a criminal discovery statute was made by counsel for Sconce, who, when the trial court suggested that defense counsel could get the information from Alameda County law enforcement agencies on their own, responded that section 1054 required that all discovery from law enforcement come through the prosecution "whether or not it's in this county." Actually, nothing in the criminal discovery statutes prohibits defense counsel from obtaining information directly from third parties, including non-investigation team law enforcement agencies. (*Barrett*, *supra*, 80 Cal.App.4th at pp. 1314-1318.)

[8] Comphel makes one oblique reference to section 1054.1 in his opening brief in discussing *People v. Bohannon* (2000) 82 Cal.App.4th 798. Under the heading stating that his constitutional right to due process had been violated by the purported discovery violation, Comphel's opening brief reads, "In *People v. Bohannon*, *supra*, 82 Cal.App.4th 798, the Court of Appeal noted that the sua sponte obligation of the prosecution to disclose material information is based in the Due Process clause of the United States Constitution, as well as the statutory obligation set forth in Penal Code section 1054.1." However, the *Bohannon* court noted, the "constitutional duty is independent of, and to be differentiated from, the statutory duty of the prosecution to disclose information to the defense." (*Bohannon*, at p. 804.) No substantive argument under a separate heading regarding a purported statutory discovery violation can be found in Comphel's opening brief. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [a brief must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"]; see *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 ["We discuss those arguments that are sufficiently developed to

12

due process being defendants' sole assertion in their opening briefs, the People understandably limit their respondent's briefing to the due process argument. In his reply brief, Comphel, for the first time, argues a violation of the prosecution's statutory obligations under section 1054.1, subdivision (e) and discusses decisional law interpreting that statute. Comphel asserts that the prosecution has a statutory obligation to provide exculpatory information "reasonably accessible to the prosecution" and to inquire of all law enforcement agencies to which it has access.[9] Because Comphel only asserts this argument in his reply brief, the People are deprived of the opportunity to address it. The statutory argument is forfeited.[10] (*People v. Adams* (1990) 216 Cal.App.3d 1431, 1441, fn. 2.)

## II. Claim of Prosecutorial Misconduct in Closing Argument

Defendants argue the trial court erred in allowing the prosecutor, in closing argument, to attack the lack of defense evidence of the victims' claimed gang association. We conclude that defendants forfeited their claim, and in any event, any error was harmless.

During the prosecutor's rebuttal argument, the following was said:

"[Prosecutor:] . . . I just want to address this photo stuff. I thought we were done talking about that. The MySpace page of [T.N.] It's very important to look back on that and realize the context. Realize the way in which those photos were presented to you at

be cognizable. To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis."].)

[9] Although Sconce does not indicate in his reply brief a desire to join in the arguments Comphel makes in his reply brief related to the discovery issues, we assume that to be Sconce's intention.

[10] It should not be implied that because we decide this claim on forfeiture grounds we agree with Comphel's legal analysis on the merits.

13

first, to determine what was the goal behind that?  Because you have zero evidence that [T.N.] is a gang member.  There are ways to prove this kind of stuff, and if they want to prove he's a gang member, *they can put an expert on the stand to say*: I investigated him and say he's had a gang --

"[Counsel for Comphel]:  I'll object.

"[Counsel for Sconce]:  I'll object.  [¶] . . . [¶]

"The Court:  Well, it's appropriate to argue that a logical witness was not called.  I'll allow it.

"[Prosecutor]:  There are ways to prove this stuff.  *Very simple ways to prove this stuff.  We do it all the time in this courthouse, very easy to establish.*

"They -- *if they want to say he's a gang member, prove it.  Do it the proper way.*  Don't bring in these sad little photos that you plucked off of the [I]nternet and shown [*sic*] to the jury out of context and say, 'We know what's going on here.  Young [B]lack kid throwing hand signals.  What looks like a gun here.  He's got a blunt in his mouth over here.  He's a gang member.

"*I'm not going [to] prove it to you, or anything.  I'm not going to go to the bother of actually proving it to you.  I'm not going to bring in any witnesses to say that.*  I just want you looking at these photos of a young [B]lack man dressed a certain way, acting a certain way, talking about certain kind of music -- music and draw ugly conclusions based on that.

"This was a smear campaign on [T.N.]  If they had any evidence that he was a gang member, you would not have seen just these photos."  (Italics added.)

Outside of the jury's presence, after the conclusion of closing arguments, counsel for Sconce stated:  "I just wanted to flush out one objection that we made during closing argument. . . .

"It was an objection to -- the gist of what [the prosecutor] was saying was that if we had the gang evidence, we would have put it on.

14

"We asked for that evidence prior to the trial and during in limines and the -- and we were ruled against in that motion.  So I just -- *the reason that we objected was because we tried to get that evidence and we were not allowed*."  (Italics added.)

The prosecutor said the fact that it would be easier for him to get evidence did not mean it was unavailable to defense counsel.  Defense counsel countered they were not statutorily allowed to get it directly from law enforcement, which led to:

"[Prosecutor]:  . . . And I was given no specific law enforcement agency too.

"The Court:  It's probably easier to go ahead and do it, though.

"[Prosecutor]:  I really had no idea what --

"The Court:  You had in mind my ruling and --

"[Counsel for Sconce]:  *I just wanted the Court* --  [¶] . . . [¶]  -- *[t]o reflect why we objected* . . . .

"The Court:  The record will so reflect.

"[Counsel for Sconce]:  Thank you."  (Italics added.)

No further objection was made and the court was not requested to admonish the jury concerning any comments made by the prosecution.

A claim of prosecutorial misconduct is preserved for appeal only if the defense makes a timely objection and requests an admonition in the trial court, unless a request for admonition would be futile.  (*People v. Hill* (1998) 17 Cal.4th 800, 820; *People v. Bradford* (1997) 15 Cal.4th 1229, 1333 (*Bradford*).)  Here, the defense initially made a timely objection when the prosecutor said, "Because you have zero evidence that [T.N.] is a gang member.  There are ways to prove this kind of stuff, and if they want to prove he's a gang member, they can put an expert on the stand to say:  I investigated him and say he's had a gang -- "  The court correctly overruled the objection, ruling that a prosecutor may comment on the failure to call appropriate witnesses.  (*People v. Cornwell* (2005) 37 Cal.4th 50, 90 (*Cornwell*), disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  But the prosecutor's subsequent statement --

15

that there are "[v]ery simple ways to prove this stuff. *We do it all the time in this courthouse, very easy to establish*" (italics added) -- was arguably objectionable. That statement referenced facts not in evidence -- the proof of gang membership by expert witnesses "all the time" in the courthouse and the notion that such proof is very easy. (See *People v. Benson* (1990) 52 Cal.3d 754, 794-795; *People v. Bolton* (1979) 23 Cal.3d 208, 213 [prosecutor may not argue facts not in evidence].) The following statement was problematic as well: "*I'm not going [to] prove it to you, or anything. I'm not going to go to the bother of actually proving it to you. I'm not going to bring in any witnesses to say that.*" (Italics added.) These statements could be understood to suggest the defense had the burden of proving these facts. However, there were no objections to either of these two comments. Nor was there a request for an admonition.

Contrary to defendants' view, we cannot say that further objections to the comments made after the court overruled the initial defense objections or a request for admonition would have been futile. First, the earlier comment specifically related to a logical witness the defense could have called. Thus, the court's initial ruling did not cover subsequent statements that were problematic for different reasons. Second, when putting the nature of the objection on the record after closing arguments, defense counsel stated the objection was grounded solely on the assertion the prosecution did not check with the police agencies to determine whether the victims were gang affiliated. Under these circumstances, we conclude an objection to the prosecutor's subsequent comments made on proper grounds and a request for an admonition to the jury would not have been futile. Moreover, an admonition could have cured any prejudice. (See *People v. Wharton* (1991) 53 Cal.3d 522, 566.)

Even assuming defendants have not forfeited the issue, we see no basis for reversal. Where prosecutorial misconduct occurs, reversal is not required unless there is prejudice. (*People v. Arias* (1996) 13 Cal.4th 92, 161; *People v. Castillo* (2008) 168 Cal.App.4th 364, 386-387 (*Castillo*).)

16

Unless a prosecutor's misconduct renders the trial fundamentally unfair (which does not apply here), misconduct warrants reversal only if it is reasonably probable that the defendant would have obtained a more favorable result absent the misconduct. (*Castillo*, *supra*, 168 Cal.App.4th at pp. 386-387 & fn. 9.) It is not reasonably probable that defendants would have obtained a better result had the prosecutor not commented upon the sufficiency of defense evidence of the claim that the victims were gang members in the way he did.

Defendants contend the prosecutor's comments "can be interpreted as an inference that [defendants have] a duty or burden to produce evidence, or a duty or burden to prove [their] . . . innocence." (Citing *Bradford*, *supra*, 15 Cal.4th at p. 1340.) Although, as we have noted, the prosecutor's comments were problematic, we conclude the comments were not prejudicial for the following reasons. First, the prosecutor's comments did not relate to the burden of proving elements of the crime, disproving self-defense, or even to the burden of proof in general. The comments related to proving the victims were gang members. Specifically, the prosecutor said, "if they want to say he's a gang member, prove it." And there was no evidence the victims were gang affiliated. Second, given the totality of the argument, we cannot conclude there was a reasonable likelihood the jury applied the comments to relieve the prosecutor of his burden of proof. (*People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203.)

Defendants press the issue of the prosecutor's duty to inquire about and disclose exculpatory evidence. They argue, "[t]he prosecutor's argument was based upon a fundamental deception, a sleight of hand[,] if you will. He knew that the defense did not have the evidence at issue, because he had done nothing to investigate their request for that very evidence - *evidence which was available only through the prosecutor's office*." (Original italics omitted, italics added.) We reject this argument.

First, as for nonprosecution team agencies, as we have noted, the information defendants sought was not solely available through the prosecutor's office. (*Barrett*,

17

*supra*, 80 Cal.App.4th at pp. 1315-1318.)  The defense could have sought that information by subpoena duces tecum.  (*Ibid*.)

Second, since the defense could have sought information from the nonprosecution team agencies, the prosecutor could fairly comment on the defense failure to present logical witnesses.  (*Cornwell*, *supra*, 37 Cal.4th at p. 90.)

Third, as for information potentially in the possession of the Tracy Police Department, defendants are correct in their assertion that the statutory discovery provisions required them to obtain that information through the prosecutor's office. (§ 1054.5.)  Yet defendants never requested that the jury be admonished to disregard the prosecutor's comments to the extent they could be understood to criticize the defense for failing to present a Tracy Police Department gang expert, an admonition that would have highlighted the failure to call an expert from an agency located where the victims resided. As we have noted, the victims were from Alameda County.  Moreover, assuming that the prosecutor's remarks were improper, defendants have failed to show how they were prejudiced by the prosecutor's comments, given that there is nothing to suggest the Tracy Police Department had such evidence and the prosecutor could have commented legitimately on the absence of gang words or other gang evidence related by the witnesses who were present at the time of the incident.

We conclude defendants have failed to show prosecutorial misconduct warranting reversal of the judgments.

### III.  Jury Instruction on Lesser Included Offense

Defendants contend the trial court erred in failing to instruct sua sponte on simple assault (§ 240) as a lesser included offense of aggravated assault (§ 245).  We conclude that the error was invited by defendants.

The trial judge accommodated the demands of both defense counsel and omitted instruction on simple assault based on the defense strategy, disclosed in camera, that it would be to defendants' advantage to present the jury with an all-or-nothing choice.

The People argue the doctrine of invited error precludes defendants from raising this issue on appeal, because they caused the court to omit the instruction. We agree with the People.

As our high court has observed, " ' "[t]he obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." ' [Citation.] [¶] Nevertheless, the claim may be waived under the doctrine of invited error if trial counsel both ' "intentionally caused the trial court to err" ' and clearly did so for tactical reasons. [Citation.] Invited error will be found, however, only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 114.) That is exactly what occurred here. Any error was invited.

## IV.  CALCRIM No. 203

Defendants argue the trial court erred in failing to instruct sua sponte with CALCRIM No. 203, that the jury must consider each defendant separately. We conclude the error was harmless.

CALCRIM No. 203 states in part:

"You must separately consider the evidence as it applies to each defendant. You must decide each charge for each defendant separately. If you cannot reach a verdict on (all/both) of the defendants, or on any of the charges against any defendant, you must report your disagreement to the court and you must return your verdict on any defendant or charge on which you have unanimously agreed.

"Unless I tell you otherwise, all instructions apply to each defendant."

The trial court has a duty sua sponte to give this instruction if multiple defendants are on trial. (*People v. Mask* (1986) 188 Cal.App.3d 450, 457 [discussing former CALJIC No. 17.00], criticized on other grounds in *People v. Simon* (1989) 208 Cal.App.3d 841, 850 & fn. 11.) Rather than choose a prejudice standard, this court

19

in *Mask* found the error harmless under the standards of both *People v. Watson* (1956) 46 Cal.2d 818, 836 and *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*). (*Mask*, at p. 457.) No subsequent case identifies one standard.

In determining whether prejudicial error occurred, we consider the instructions as a whole and assume jurors are intelligent persons capable of understanding and correlating the instructions. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Here, the jury was instructed with CALCRIM No. 220: "A defendant in a criminal case is presumed to be innocent," and the prosecution must "prove a defendant guilty beyond a reasonable doubt" (though the instruction says the jury must find "them" not guilty unless the evidence proves "the defendants" guilty beyond a reasonable doubt). The court instructed the jury that unless the jurors all agreed on which act or acts "the defendant" committed, they must find "the defendant" not guilty. The trial court presented the jury with separate verdict forms for the two defendants and instructed, "If you are able to reach a unanimous decision on *only one of the defendants*, fill in those verdict forms only, and notify the bailiff. . . ." (Italics added.)

Comphel says that given the state of the evidence, it is understandable that the jury found the hate crime allegation not true, and it is also reasonable to conclude that the jury might have convicted him based more upon the guilt of Sconce than on Comphel's own conduct. However, Comphel fails to explain why this would be reasonable. He argues the evidence described a chaotic scene without clarity as to which group precipitated the fight. He argues that, at one time or another, both he and Sconce might have been holding knives. The neighbor saw a shiny object in Comphel's hand after Comphel had been knocked to the ground. As the fight evolved, the victims became the aggressors and chased defendants down the street. T.N., who acknowledged he has poor vision, identified Comphel at the scene not by his face but by his clothing. However, T.N. made an in-court identification of Comphel during the trial where, due to T.N.'s vision issue, the judge allowed him to leave the witness stand to see if he recognized anyone in the

20

courtroom.  During the assault, Comphel came within a couple of feet of T.N.  In sum, it is not reasonable to believe the jury might have convicted Comphel based not on his own conduct but on Sconce's conduct.

Under the circumstances of this case, no rational juror would have failed to understand that he or she had to decide each defendant's fate separately.  We conclude the absence of CALCRIM No. 203 was harmless, even under the *Chapman* standard.

## DISPOSITION

The judgments are affirmed.


                                        MURRAY         , J.



We concur:



        HULL          , Acting P. J.



        BUTZ          , J.


21